USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  5/5/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAUL CORTEZ,

                              Petitioner,

        -against-

SUPERINTENDANT GRIFFIN,

                              Respondent.

18-CV-766 (PAE) (JLC)

**REPORT AND
RECOMMENDATION**

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable Paul A. Engelmayer, United States District Judge:**

Paul Cortez brings this petition for a writ of habeas corpus under 28 U.S.C. §

2254, challenging his 2007 conviction in the Supreme Court of the State of New

York, New York County, following a jury trial, of Murder in the Second Degree.

Cortez was sentenced to imprisonment for 25 years to life.  For the reasons set forth

below, I recommend that his petition be denied.

**TABLE OF CONTENTS**

I. BACKGROUND ...................................................................................................... 1

   A.  Overview ........................................................................................................... 1

   B.  The Trial .......................................................................................................... 2

      1.  The State's Case ...................................................................................... 2

         a.  Cortez and Woods's Relationship ................................................. 2

         b.  The Events of November 27, 2005 ............................................... 5

         c.  Other Evidence Presented at Trial ............................................... 9

      2.  The Defense Case ................................................................................... 9

   C.  Post Conviction Proceedings ....................................................................... 11

      1.  Motion for DNA Testing Pursuant to § 440 ................................... 11

      2.  Cortez's Direct Appeal ....................................................................... 12

      3.  Coram Nobis Petition ......................................................................... 14

      4.  Motion to Vacate Pursuant to § 440.10 ........................................... 14

      5.  Federal Habeas Petition ..................................................................... 16

II. DISCUSSION ...................................................................................................... 17

   A.  Legal Standards for Habeas Relief Under § 2254 ..................................... 17

      1.  Exhaustion Doctrine ........................................................................... 17

      2.  Procedural Bar to Claims Deemed Exhausted ............................... 18

         a.  Independent and Adequate State Grounds for Procedural Bar .............. 19

         b.  Exceptions to Procedural Bar ..................................................... 20

      3.  The Antiterrorism and Effective Death Penalty Act ..................... 22

   B.  Analysis ......................................................................................................... 23

      1.  Actual Innocence Gateway Claim ..................................................... 24

         a.  The Claim Appears to Be Credible .............................................. 26

         b.  The Claim is Not Compelling ....................................................... 30

      2.  Ineffective Assistance of Counsel Claims ........................................ 32

         a.  No Procedural Bar to Review ...................................................... 33

         b.  Standard for Claims of Ineffective Assistance of Counsel ...................... 35

         c.  Application ..................................................................................... 37

            i.  Conflict-Based Ineffective Assistance of Counsel Claim ..................... 37

            ii.  Substance-Based Ineffective Assistance of Counsel Claim ................. 41

               (a)  Performance Prong Under *Strickland* ................................ 42

(1)   Fingerprint Evidence .................................................................... 42

(2)   Surveillance Video ....................................................................... 44

(3)   DNA Testing ................................................................................ 45

(4)   Cell Phone Records ...................................................................... 47

(5)   Witness Interviews ...................................................................... 48

(b)   Prejudice Prong Under *Strickland* ................................................. 50

3.   Prosecutorial Misconduct Claim ....................................................... 56

III. CONCLUSION ................................................................................. 59

# I. BACKGROUND

## A.    Overview

The following facts are drawn from the record of proceedings before the state trial court.[1]  In view of Cortez's conviction, the Court summarizes the evidence presented at trial in the light most favorable to the verdict.  *See Garbutt v. Conway,* 668 F.3d 79, 80 (2d Cir. 2012) (citation omitted).

On November 27, 2005, 21-year-old Catherine Woods was murdered in her Manhattan apartment.  The police found what appeared to be a handprint in blood on the wall of Woods's bedroom where she was killed, which included a latent fingerprint that belonged to Cortez, Woods's ex-boyfriend.  The police also found what appeared to be a boot print in blood that matched a boot Cortez had been seen wearing.  Although the murder weapon was never found, the police found Cortez's private journals in which he had written poetry and other entries about killing, death, and murdered women.  Additionally, cell phone records place Cortez in the vicinity of Woods's apartment at approximately the time she was killed, and demonstrate that Cortez called Woods numerous times the day she was killed, but stopped around the time believed to be her time of death.  The defense maintained

---

[1] The transcript of Cortez's trial ("Tr."), was submitted to the Court on a CD accompanying respondent's opposition papers, and the People's Appendices ("PA") and the post-conviction litigation record ("RA") are docketed on the Electronic Case Filing System ("ECF") as docket entry number 30, Exhibits 1-7.  Pinpoint citations refer to the pagination that runs throughout the transcripts and record.  If there is no state court record citation available, the Court cites to the docket number ("Dkt. No.") and pagination of the document on ECF.

Cortez's innocence, calling witnesses to testify to his gentle, emotional side and painting David Haughn, Woods's on-and-off boyfriend with whom she was living when she died, to be the actual murderer.

Cortez was charged under New York County Indictment Number 6433/2005 with Murder in the Second Degree.  Prior to trial, the state court denied Cortez's motions to suppress statements he had made to the police and his fingerprints, concluding they had been lawfully obtained.  On January 29, 2007, Cortez's jury trial commenced before the Honorable Carol Berkman.  On February 15, 2007, the jury convicted him as charged, and on March 23, 2007, the court sentenced him to 25 years to life.

**B.    The Trial**

**1.    The State's Case**

**a.    Cortez and Woods's Relationship**

In the fall of 2004, while living with her on-and-off boyfriend, Haughn, at a building on East 86th Street near the corner of First Avenue, Woods met Cortez, the lead singer of a band named Monolith, Tr. at 67, 230, 788, 1000, and a tumultuous relationship ensued. Two specific incidents were emphasized at trial.  First, in the spring of 2005, someone buzzed Woods's and Haughn's apartment multiple times, even after Woods told the individual to go away.  *Id.* at 803–04.  Haughn walked outside to see who buzzed.  *Id.* at 804.  As he was walking out, he passed someone who resembled Cortez.  *Id.*  When Haughn returned to the apartment, Woods was speaking with Cortez and she told Haughn that she needed to "take care of

something" and asked Haughn to wait in the hallway.  *Id.* at 804–05.  Haughn observed that Woods appeared upset with Cortez.  *Id.* at 878.

When Cortez left the apartment, he told Haughn, "I need to talk to you about something."  *Id.* at 805.  The two men went outside together and walked toward Second Avenue and Cortez said that he had been romantically involved with Woods since August.  *Id.* at 805–06.  Haughn testified that Cortez told him he was "giving up on" his relationship with Woods.  *Id.* at 879.  When Haughn returned to the apartment, Woods denied that she and Cortez had been romantically involved. Woods described Cortez as "crazy" and said, "[d]on't listen to him."  *Id.* at 807. Woods explained that she and Cortez were only friends: they spent time together, went to the gym together, and went out to eat.  *Id.* at 881.

On another occasion that spring, Cortez phoned Woods's father, John Woods ("John"), whom he did not know.  *Id.* at 92.  Cortez told John that Woods had been "drugged" the night before at a club called "Privilege," where Woods had been working as a stripper to earn more money.  *Id.* at 92–93, 792.  Cortez told John that he had taken Woods to the hospital and left her there with a friend.  *Id.* at 93. Cortez also told John that Woods had been "stripping," was addicted to alcohol and drugs, and was involved in prostitution.  *Id.*

John flew to New York the next day and confronted Woods with Cortez's allegations.  *Id.* at 96.  Woods denied the allegations and appeared very upset; she did not appear sick or to have been in a hospital.  *Id.* at 96–97.  Woods told her father that Cortez had been calling her incessantly.  *Id.* at 97.  In fact, Cortez had

been calling her at work, trying to get her fired, and she planned to get a restraining order against him.  *Id.*

The State also presented Cortez's journal entries from this time period, which included letters and poems that were often about women and often very violent in nature.  For example, on December 1, 2004, Cortez wrote a poem about a woman that included the line: "[s]he wipes clean the shaft that cuts her throat."  *Id.* at 1222–23.  In a journal entry dated March 20, 2005, Cortez wrote that he had "saved" Woods "from rape."  *Id.* at 1224.

By the summer of 2005, although Haughn continued to live with Woods, they were, by Haughn's account, taking a break from their relationship.  *Id.* at 796.  That same summer, while working as a trainer at a gym, Cortez spoke about his "girlfriend" to one of his clients, Stephanie Nicole Bucci.  *Id.* at 1032–33.  Bucci observed that the relationship appeared to be "on and off" and that Cortez was going through a "hard time" in the relationship.  *Id.* at 1033–34.

The State presented another of Cortez's journal entries, dated October 12, 2005, in which he wrote a song titled, "The Killin' Machine," which described a woman being "violated" and "rip[ped] apart" by a "gang of lunatics."  *Id.* at 1229–30.  In November 2005, Cortez told Bucci and his friend Spenser Lebowitz that he and Woods had broken up.  *Id.* at 1035, 1354–55.

### b.    The Events of November 27, 2005

On November 27, 2005, Cortez and his client, Bucci, spent the afternoon shopping on the Upper East Side.  *Id.* at 1036–42.  While at a grocery store on 82nd Street and 3rd Avenue, Cortez received a phone call and told the caller he was with a "beautiful blonde thirty-six-year-old professional woman" and then made a lewd remark.  *Id.* at 1043.  Around 4:00 p.m., Cortez and Bucci parted ways on the corner of 82nd Street and Lexington Avenue.  *Id.* at 1045.

Between 5:00 p.m. and 6:00 p.m. that night, Cortez and Woods exchanged a number of phone calls, some answered, and some unanswered.  The first call between Woods and Cortez was routed to Cortez through a cell tower on East 105th Street, a few blocks from his apartment.  *See* PA 21, 22; *see also* Tr. at 587–600. Between 5:05 p.m. and 5:14 p.m., Cortez tried to call Woods seven times; each call lasted only a few seconds and Woods returned only one of the calls.  PA 21, 22.   All of those calls were routed to and from Cortez's phone through the cell tower on 105th Street.  PA 21, Tr. at 604–05.  At 5:27 p.m., Cortez tried to call Woods again; that call lasted one second and originated from a cell tower located at East 86th Street and Madison Avenue.  PA 21, 22.  Between 5:36 p.m. and 5:56 p.m., Cortez made several more attempts to call Woods; those calls originated from a cell tower located at 354 East 84th Street.  PA 21, 22.  During that time, Woods and Haughn were in their apartment near 86th Street and First Avenue, two blocks directly north of the cell tower, where Woods was getting ready for work.  Tr. at 827–29.

Sometime after 6:00 p.m., Haughn went to 87th Street to retrieve his car in order to drive Woods to work. *Id.* at 830–31. Haughn did not lock the apartment door. *Id.* at 836. Notably, the building's front gate and lobby door often remained unlocked. *Id.* at 223–26. On the way to his car, Haughn stopped at a building on 87th Street where he worked the night shift as a doorman to retrieve a music CD and where he conversed for several minutes with another doorman, Abdul Khalik, and the building superintendent, Joseph Tabone, both of whom testified at trial. *Id.* at 831. Haughn then retrieved his car. *Id.* at 832.

Between 6:18 p.m. and 6:40 p.m., Woods's and Haughn's upstairs neighbor, Andrew Gold, was on the phone with his fiancée, Donna Propp. *Id.* at 208–10. During the call (Gold estimated the time to be 6:25 p.m.) he heard a woman scream loudly twice downstairs. *Id.* at 212–13. He estimated the time from the first scream to the second was a total of five minutes. *Id.* After Gold got off the phone, he went to the stairwell, looked upstairs and downstairs, and yelled, "[i]s there anyone out there?" *Id.* at 215. Hearing no response, Gold "figured there was nothing going on." *Id.* He did not call 911 and left the building a few minutes later. *Id.* at 237, 248.

At 6:33 p.m., Cortez's cell phone dialed Woods one last time; the call lasted just one second and was routed through the 354 East 84th Street cell tower. PA 21. He made numerous calls from his cell phone after 6:33 p.m., but his phone records showed no further attempts to call Woods. PA 21, 22. Cell site records tracked Cortez's movements home: he made two calls at 6:50 p.m. routed

through a cell tower near 95th Street and First Avenue; a call at 7:16 p.m. routed through a cell tower near the subway stop on 110th Street and Lexington Avenue; and calls at 7:55 and 7:57 p.m. routed through a cell tower on East 105th Street, near his apartment. *Id.*

Meanwhile, after retrieving his car, Haughn drove to the corner of 86th Street and First Avenue and called Woods to let her know he was waiting. Tr. at 833–35. Woods did not answer his call so Haughn went to the building and buzzed the apartment. *Id.* at 835. After still not hearing from Woods, Haughn entered the building and at the gate, a neighbor told him that one of his dogs, a Labrador, had been running down First Avenue, and the neighbor had retrieved the dog for him. *Id.* at 835–37. Haughn then entered his apartment and found the door closed but unlocked. *Id.* at 837–38. There was blood "everywhere," and things were "all over the place." *Id.* at 838–39. Haughn saw Woods lying on the floor in a pool of blood. *Id.* at 839.

At 6:59 p.m., Haughn called 911 and said that he had just come home and found his girlfriend unconscious and he did not know if she was alive. *Id.* at 260–65. Haughn, who was wearing Adidas sneakers, saw boot tracks on the bed sheets pointing out of the bedroom. *Id.* at 840. He told the 911 operator about the boot tracks and surmised that someone had been in the apartment. *Id.* at 840–41.

When police and paramedics arrived on the scene, Haughn was in a state of shock. *Id.* at 190–91. The paramedics turned Woods over, revealing a "huge laceration" on her neck and determined she was dead. *Id.* at 135–36. A police

detective, Detective Goetz, asked who might have committed the crime; Haughn replied that someone named "Paul" or "Paul Vincent" had been stalking Woods. *Id.* at 1161.

Haughn cooperated with the police, providing fingerprints, fingernail scrapings, and a DNA sample. *Id.* at 846–48. He also prepared a written statement, *id.* at 848, and spoke to the police on multiple occasions. *Id.* at 851.

The evening of Woods's murder, Cortez did not show up for his band practice, which had been scheduled for 6:00 p.m. and told his band member that he accidentally overslept. *Id.* at 1003–04. At around 8:00 p.m., Cortez invited his friend, Lebowitz, to watch football at a bar on the Upper East Side. *Id.* at 1340. Lebowitz testified that Cortez was wearing a black leather jacket, jeans, and black boots. *Id.* at 1339–40; PA 22. Cortez acted very depressed about the football game and did not mention his girlfriend that night. *Id.* at 1342. At trial, Lebowitz identified the exact style of boots that Cortez was wearing—a Sketchers boot that matched the bloody boot prints found on Woods's bed. *Id.* at 1346–47.

The morning after the murder, two police officers spoke to Cortez at his apartment on 106th Street; Cortez's mother was also there. *Id.* at 931–33. Cortez agreed to come to the precinct, where he recounted his afternoon with Bucci and his evening with Lebowitz, but said nothing about his activities between 5:30 and 8:00 p.m. *Id.* at 933–34, 941–44.

### c.    Other Evidence Presented at Trial

Forensic testing presented at trial established that all of the blood found in the apartment belonged to Woods.  In particular, on one of the bedroom walls, crime scene detectives found a blood pattern that appeared to include a "hand transfer" pattern—bloody spots showing where someone had touched the wall.  *Id.* at 367–77. The hand transfer pattern was "patent," or visible to the naked eye.  *Id.* at 367–68. A police forensic scientist, Alex Chacko, subsequently treated the wall with amido black, a chemical that reacts with a protein present in blood.  *Id.* at 431–36. Chacko explained that, if a blood stain contains a fingerprint not visible to the naked eye, amido black reacts with proteins present in blood "to show a purple color print."  *Id.* at 457–58.  The reaction revealed a latent fingerprint underneath one of the blood spots.  *Id.* at 462.  The latent fingerprint found on the wall was subsequently matched to Cortez's left index finger.  *Id.* at 551, 554.

### 2.    The Defense Case

At trial, defense counsel argued that Cortez was innocent and attempted to present Haughn as the killer.  In support of their theory, counsel made the following assertions: the surveillance camera, on the adjacent building facing the street did not show Cortez, *id.* at 1241–42; Haughn was in the apartment at the time neighbor Andrew Gold heard a scream, *id.* at 1903; the murder weapon was never found, *id.* at 1232; boots matching the boot print were never recovered from Cortez's apartment, *id.* at 1891; the hair Woods clutched in her hands at the time of her death did not belong to Cortez, but was light in color like Haughn's, *id.* at 1884–85;

9

and, importantly, the fingerprint found at the scene of the crime was made before Woods was murdered, and was not part of Woods's blood splatter, *id.* at 1895.

Cortez testified at trial, admitting that he had been near Woods's apartment around the time she was murdered but denying that he had entered her apartment that day. *Id.* at 1717, 1725, 1778–79. Cortez did not deny that the fingerprint found on the wall was his, but instead asserted that he had made the print at some prior time. *Id.* at 1775–76. He stated that he had probably touched every wall in Woods's bedroom at some point, and speculated that he might have touched the wall after touching her menstrual blood. *Id.* at 1776.

In addition, Cortez claimed that his explicit journal entries did not refer to violent thoughts about Woods or his previous girlfriends. *Id.* at 1795–1813. He offered long explanations for his writings and his drawings of swords and knives, for example one was an attempt to "delve into" emotions when auditioning for a role in a play, and that other drawings of people with knives were "doodles" of comic book characters. *Id.* at 1538, 1803. Cortez asserted that "The Killin' Machine" was a "hard core rock song" that he wrote for his band, *see id.* at 1796, and that his reference in the following journal entry to the electric chair was about being wrongfully convicted, *see id.* at 1767.

The defense called several witnesses besides Cortez including: Ivette Cortez, Cortez's mother, *id.* at 1853; Wilfredo Acosta, his best friend from high school, *id.* at 1382; and Jacqueline Kornblum, his high school English teacher, *id.* at 1465. These witnesses testified to what they knew of Woods's and Cortez's relationship, Cortez's

10

longtime propensity for dramatic and dark topics in his writing, and reported that

Cortez was honest, generous, and peaceful.  The defense also called police

witnesses, including Detective Paul Grubb who interviewed Gold, *id.* at 1493, and

Detective Thomas Ryan and Officer John Sheedy, the officers who interviewed

Haughn the night Woods was killed, *id.* at 1369, 1484.

### C.    Post Conviction Proceedings

#### 1.    Motion for DNA Testing Pursuant to § 440

Following the jury's verdict convicting him of Murder in the Second Degree,

on August 25, 2008, Cortez filed a post-conviction motion in the trial court pursuant

Section 440 of the New York Criminal Procedure Law ("CPL").  Cortez sought an

order authorizing DNA testing to be performed "by a private expert at defense

expense," of various items of physical evidence.  RA at 686.  Specifically, Cortez

sought DNA testing of (1) strands of hair found around Woods's body; (2) strands of

hair Cortez claims were "clutched" in Woods's hands; (3) Woods's fingernail

scrapings; and (4) a knife found in the apartment sink, which Cortez alleges was

"bloody."  *Id.* at 684–85.  Cortez asserted that the State's case at trial had been

based on "questionable inferences" drawn from the cell phone evidence, excerpts

from his diaries that were "artistic fancy" and a fingerprint that was "equivocal"

because "it could not be dated" among other things.  *Id.* at 684.

The trial court denied Cortez's motion on October 20, 2008, finding that first,

Cortez's trial counsel had been authorized to retain experts prior to trial so the law

did not grant him a second opportunity, and second, there was no "reasonable

probability that the results of the DNA testing [Cortez sought] would have resulted

in a verdict more favorable." *Id.* at 704.  The court concluded that testing the hairs
or the knife would not yield results that would cut against the rest of the "major
pieces of evidence" against Cortez, namely, the "fingerprint in blood," "that he was
in the vicinity at the time of the killing," and his "incessant telephone calls to
[Woods] which ceased at or about the time of her death." *Id.* at 704.

Cortez then filed a notice of appeal from the court's decision, which the
Appellate Division agreed to stay, at Cortez's request, pending his direct appeal. *Id.*
at 707.

### 2.    Cortez's Direct Appeal

On direct appeal to the New York Appellate Division, First Department,
Cortez argued that both of his trial counsel ("counsel"), Laura Miranda and Dawn
Florio, had labored under conflicts of interest, specifically that Miranda was
conflicted because she had been held in contempt of court prior to trial, and that
Florio was conflicted because of a criminal case pending against her in New York
state court. *Id.* at 1–284.  Rejecting these arguments, the Appellate Division
affirmed his conviction on June 2, 2011. *See People v. Cortez*, 85 A.D.3d 409 (1st
Dep't 2011).  The Appellate Division held that the contempt citation against
Miranda "was not enough to create a conflict." *Id.* at 410.  As to a possible conflict
with regard to Florio, the Appellate Division held that the trial court conducted
"sufficient inquiry" to find that Cortez had waived any conflict. *Id.*  Finally, the
Appellate Division rejected Cortez's remaining claims, including that he received
ineffective assistance of counsel, because to the extent he claimed "his attorneys

mishandled various aspects of the extensive forensic evidence against him, by failing to take certain investigative steps," such claims were "unreviewable on direct appeal, and thus procedurally defective, because they involve matters outside the record." *Id.*

Cortez was granted leave to appeal to the New York Court of Appeals on July 17, 2012. *See People v. Cortez*, 973 N.E.2d 765 (2012). On appeal, Cortez reiterated his claims regarding his counsels' conflicts and claimed that his journal entries regarding two previous girlfriends should have been excluded from trial. RA at 288–670. In a summary decision, the Court of Appeals held that Cortez did not raise any errors "warranting a reversal of his conviction." *People v. Cortez*, 4 N.E.3d 952 (2014). In a concurring opinion, then-Chief Judge Lippman found that although Cortez had not sufficiently waived Florio's conflict and that the trial court inquiry was lacking, Florio's conflict was still potential and not actual, and did not "operate[] on the defense." *Cortez*, 4 N.E.3d at 957 (Lippman, C.J., concurring).[2] With regard to Cortez's claims that counsel was ineffective, the Court of Appeals added, "that [claim] would be appropriately raised, if at all, on a motion pursuant to CPL 440.10. It is not reviewable on the present record." *Id.*

---

[2] The one sentence affirmance issued by the Court of Appeals did not address the issues Cortez presented on appeal. Chief Judge Lippman wrote separately, 4 N.E.3d at 952–59, and to the extent his concurrence considered issues now presented here, the Court will look to his concurrence as appropriate. Other courts have cited to this concurrence as well. *See, e.g., Rivers v. Smith*, No. 13-CV-4786 (NGG), 2016 WL 7031557, at *5 (E.D.N.Y. Dec. 1, 2016)*; People v. Brown*, 124 N.E.3d 247, 250 (N.Y. 2019).

Cortez sought a writ of certiorari to the United States Supreme Court, which was denied on October 6, 2014. *See Cortez v. New York,* 135 S. Ct. 146 (2014).

### 3.    Coram Nobis Petition

Cortez filed a coram nobis petition on September 15, 2015, arguing that his appellate counsel should have challenged the trial court's denial of his motion to suppress. RA at 708–1053. The Appellate Division denied the petition in a summary order on March 17, 2015. *Id.* at 1054.

### 4.    Motion to Vacate Pursuant to § 440.10

Cortez then moved to vacate his conviction pursuant to CPL § 440.10 on March 21, 2016. He argued that he was actually innocent and that his trial counsel had provided ineffective assistance. *Id.* at 1055–1138.[3] Specifically, Cortez argued that his counsel had failed to introduce video surveillance that allegedly showed Haughn leaving Woods's building at 6:37 p.m., which Cortez contends was right after the murder. *Id.* at 1065. Further, counsel failed to call their own experts to dispute the State's forensic evidence of the fingerprint in blood and cell phone records, failed to seek DNA testing for the hairs and failed to interview certain witnesses. *Id.* at 1067–71; 1080.

The court ("440 Court") denied Cortez's motion. The 440 Court observed that Cortez had sought DNA testing in his previous § 440 motion, which had been

---

[3] In his notice of motion to the 440 Court, Cortez only made a claim of actual innocence as a <u>freestanding</u> claim. Pet. Rep. at 27. It was not until he submitted his reply papers in support of his 440 motion that he asserted that he was also raising actual innocence as a <u>gateway</u> claim. *Id.* The distinction is discussed further below.

denied, because the "hair evidence in this case was not dispositive." *Id.* at 1259.  It further noted that his "new motion add[ed] nothing to the arguments which would merit revisiting the issue, much less coming to a different conclusion." *Id.*

The 440 Court also ruled that Cortez had not presented "clear and convincing evidence of his innocence, nor ha[d] he presented any evidence of merit to warrant a hearing." *Id.* at 1268.  Instead, his arguments went only to "the sufficiency of the evidence" and his theory "promoting Haughn as the perpetrator of this murder [was] fully examined at trial, and rejected by the jury." *Id.* at 1267–68.

Additionally, the 440 Court rejected Cortez's contention that new evidence cast doubt upon the fingerprint evidence. *Id.* at 1268–73.  It concluded that Cortez's argument in his second 440 motion, in which he disputed for the first time that the fingerprint was his, "contradict[ed] his testimony and the defense theory at trial" where he had not disputed that the fingerprint was his. *Id.* at 1271.  The 440 Court ruled that Cortez's newly-proffered evidence was not of such a character that it would "probably change the result if a new trial [were] granted." *Id.* at 1268, 1273, explaining that the fingerprint evidence, combined with the "extensive" circumstantial evidence, "provided overwhelming proof of [Cortez's] guilt." *Id.* at 1271 (internal quotation marks omitted).

Finally, the 440 Court rejected Cortez's claims of ineffective assistance of counsel.  It observed that its job was not to "second-guess counsel, or to assess counsels' performance with the clarity of hindsight, effectively substituting its own judgment of the best approach to the case." *Id.* at 1279.  Indeed, "[t]he test is

reasonable competence, not perfect representation." *Id.* Moreover, the court observed that petitioner bore the burden of "demonstrat[ing] the absence of strategic or their legitimate explanations for counsels' alleged deficiency." *Id.*

On August 29, 2017, Cortez moved for reargument before the 440 Court. Notice of Motion to Reargue, Dkt. Nos. 45–46. After the State opposed and Cortez replied, the 440 Court issued a decision denying his request for reargument on December 7, 2017. Decision and Order ("Rearg. Dec.").

Cortez sought leave to appeal the 440 Court's decision to the Appellate Division, but his request was denied on January 11, 2018. RA at 1284.

### 5.   Federal Habeas Petition

Cortez timely filed this habeas petition on the docket on January 24, 2018. Petition for Writ of Habeas Corpus, Dkt. No. 2.[4] Along with his petition, Cortez filed a number of exhibits, including the expert affidavits he had previously submitted to the 440 Court. Dkt. No. 2-9. After the Court granted his request for assignment of counsel, Dkt. No. 14, he filed an amended petition raising four grounds: (1) he is actually innocent of the crime, in light of "newly discovered video evidence" and "new expert testimony"; (2) both of his trial attorneys were burdened by conflicts of interest; (3) his trial attorneys provided ineffective assistance; and (4)

---

[4] Respondent argues that the petition "appears to be timely, but just barely." Resp. Opp. at 28 n.7. However, accounting for the prison-mailbox rule, the petition should be deemed to have been filed on January 14, 2018 (Dkt. No. 2 at ECF 28), the date that Cortez, then proceeding *pro se*, dated his petition and presumably gave it to a prison official for mailing. *See, e.g., Houston v. Lack*, 487 U.S. 266, 271–72 (1988).

the prosecutor engaged in misconduct.  Amendment of Petition for Writ of Habeas Corpus ("Am. Pet."), Dkt Nos. 18–21.

Respondent filed its opposition on December 24, 2018, and an amended memorandum of law on December 26, 2018.  Memorandum of Law in Support of Answer Opposing Petition for a Writ of Habeas Corpus ("Resp. Opp."), Dkt. Nos. 30–31.  Along with its response, respondent filed appendices containing the state court record.  Dkt. Nos. 30-1–30-7.  Cortez filed a reply in support of his petition on April 11, 2019.  Petitioner's Reply Writ of Habeas Corpus ("Pet. Rep."), Dkt. Nos. 37–39.[5] Along with his reply, Cortez filed Exhibits A through F.  Dkt. Nos. 40–46.

This case was referred to me for a report and recommendation on November 2, 2022.  Dkt. No. 49.[6]

## II. DISCUSSION

### A.    Legal Standards for Habeas Relief Under § 2254

#### 1.    Exhaustion Doctrine

Under 28 U.S.C. § 2254, a federal court may not grant habeas relief unless the petitioner has first exhausted his claims in state court.  *See* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—(A) the applicant has exhausted the remedies available in the courts

---

[5] Although the docket calls Cortez's reply a "First Motion for Hearing," it is actually a reply in support of his petition, as clarified by the Court's order dated April 12, 2019.  Dkt. No. 47.

[6] The case had previously been referred to Magistrate Judge Debra Freeman, who retired in April, 2022.

of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant."); § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition.").

### 2.    Procedural Bar to Claims Deemed Exhausted

Under "the doctrine of procedural default, . . . a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012) (citing *Coleman v. Thompson*, 501 U.S. 722, 747–48 (1991)).  If a petitioner has failed to raise a particular claim in state court and would be precluded from doing so now because of a state procedural rule, the federal court "'must deem the claim procedurally defaulted.'"  *Jones v. Murphy*, 694 F.3d 225, 247 (2d Cir. 2012) (quoting *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011).  Under these circumstances, the claim meets the technical requirements for exhaustion because state remedies are no longer "available" to the petitioner.  *Coleman*, 501 U.S. at 732 (citing 28 U.S.C. § 2254(b)).

###### a. Independent and Adequate State Grounds for Procedural Bar

When a petitioner "fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review." *Cone v. Bell*, 556 U.S. 449, 465 (2009) (citing *Coleman*, 501 U.S. at 731). A state court's reliance on the state procedural rule must be "clear from the face of the opinion" in order for it to qualify as an independent state law ground that would foreclose federal habeas review. *Coleman*, 501 U.S. at 735 (citation omitted). A state law ground is "only adequate to support the judgment and foreclose review of a federal claim if it is 'firmly established and regularly followed' in the state." *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir. 2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).

However, even when the state law ground is firmly established and regularly followed, there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee*, 534 U.S. at 376. The Supreme Court has outlined three factors that courts must consider in determining whether a state court's application of a firmly established and regularly followed state procedural rule is "exorbitant." *Id*. at 381. These considerations, though not dispositive for determining adequacy, serve as guidelines in evaluating "'the state interest in a procedural rule against the circumstances of a particular case.'" *Garvey*, 485 F.3d at 714 (quoting *Lee*, 534 U.S.

at 381).  As adopted and summarized by the Second Circuit, the factors a court

must consider include:

> (1) whether the alleged procedural violation was actually
> relied on in the trial court, and whether perfect
> compliance with the state rule would have changed the
> trial court's decision; (2) whether state caselaw indicated
> that compliance with the rule was demanded in the
> specific circumstances presented; and (3) whether
> petitioner had "substantially complied" with the rule
> given "the realities of trial," and, therefore, whether
> demanding perfect compliance with the rule would serve a
> legitimate governmental interest.

*Cotto v. Herbert,* 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee,* 534 U.S. at 381–85).

### b.   Exceptions to Procedural Bar

When a federal *habeas* court deems such claims exhausted by virtue of the

procedural default, the court cannot reach the merits of the claims "unless the

prisoner can demonstrate cause for the default and actual prejudice as a result of

the alleged violation of federal law, or demonstrate that failure to consider the

claims will result in a fundamental miscarriage of justice."  *Coleman,* 501 U.S. at

750.

To establish cause, a petitioner must demonstrate that "some objective factor

external to the defense impeded counsel's efforts to comply with the State's

procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Gutierrez v.*

*Smith*, 702 F.3d 103, 111–12 (2d Cir. 2012).  "A petitioner suffers actual prejudice if

the outcome of the case would likely have been different absent the alleged

constitutional violation."  *Collins v. Artus*, No. 08-CV-1936 (PKC) (JCF), 2009 WL

2633636, at *8 (S.D.N.Y. Aug. 26, 2009) (citing *Reed v. Ross*, 468 U.S. 1, 12 (1984)).

20

Absent a demonstration of cause and prejudice, a petitioner is entitled to *habeas* review only if he can demonstrate that denying review would result in a "fundamental miscarriage of justice." *Murray*, 477 U.S. at 495–96. A court may only grant such relief in an "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496. To be credible, a claim of actual innocence must be supported by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Actual innocence "'means factual innocence, not mere legal insufficiency.'" *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

"Federal law as of yet does not recognize freestanding actual innocence claims." *Bryant v. Thomas*, 725 F. App'x 72, 73 (2d Cir. 2018); *see also McQuiggin v. Perkins,* 569 U.S. 383, 392 (2013). An actual innocence claim is thus "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012) (quoting *Schlup*, 513 U.S. at 315). "In other words, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims (here, ineffective assistance of counsel) on the merits notwithstanding the existence of a procedural bar to relief." *McQuiggin*, 569 U.S. at 392.

### 3. The Antiterrorism and Effective Death Penalty Act

The Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to claims that overcome the exhaustion and procedural hurdles and warrant substantive review; AEDPA "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Jones*, 694 F.3d at 234 (quoting *Hardy v. Cross*, 565 U.S. 65, 66 (2011)). Under AEDPA, courts may only grant a *habeas* petition if the challenged state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time of the state court decision; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

Under the first prong, "section 2254(d)(1)'s 'contrary to' and 'unreasonable application of' clauses have independent meaning." *Carmichael v. Chappius*, 848 F.3d 536, 544 (2d Cir. 2017) (citing *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000)). "A state court decision is 'contrary to . . . clearly established Federal law, as determined by the Supreme Court' when 'the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" *Id.* at 544 (quoting *Williams*, 529 U.S. at 412–13); *see also Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) (circuit precedent, even if "merely reflect[ing]" Supreme Court precedent, does not constitute "clearly established federal law" for purposes of § 2254(d)(1)).

A state court makes an unreasonable application of federal law if it "correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." *White v. Woodall*, 572 U.S. 415, 426 (2014).  Such application of federal law must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *Id.* at 419 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)).  "The state court decision must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.'" *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *White*, 572 U.S. at 420).  The standard "is difficult to meet," and it was intended to be.  *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

Under the second prong, a state court's determination of fact "may not [be] characterize[d] . . . as unreasonable 'merely because [a reviewing court] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).  Instead, § 2254(d)(2) requires a reviewing court to "accord the state trial court substantial deference.  If '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.*

**B.   Analysis**

As noted, Cortez asserts the following grounds for relief in his amended habeas petition: (1) he is actually innocent and thus overcomes any procedural bars;

(2) he received ineffective assistance of counsel due to his counsels' conflicts; (3) he received ineffective assistance of counsel due to his counsels' failures to properly investigate and test the prosecution's case; and (4) he was the victim of prosecutorial misconduct.  Each ground will be discussed in turn.

### 1.    Actual Innocence Gateway Claim

Cortez contends that he is actually innocent and thus overcomes any procedural bars his constitutional claims might face.  Pet. Rep. at 24.  Because federal law does not yet recognize freestanding actual innocence claims, a claim of actual innocence can only act as a "gateway" through which a petitioner's otherwise procedurally barred constitutional claims can be heard.  *Rivas*, 687 F.3d at 540. Here, the Court finds that most of Cortez's claims are not procedurally barred, but for completeness, will consider the merits of his actual innocence gateway claim.

Cortez contends that the 440 Court incorrectly evaluated his claim as a freestanding actual innocence claim without also addressing it as a gateway claim. Pet. Rep. at 27.  Respondent also evaluates Cortez's claim as a freestanding actual innocence claim, arguing that the claim is not cognizable upon federal habeas review because there is no Supreme Court precedent that clearly establishes such a claim as a constitutional right.  Resp. Opp. at 30.   In addition, Respondent argues that even if Cortez's claim is characterized as a gateway claim under *Schlup*, it still fails.  Resp. Opp. at 45.

Notably, aside from asserting his actual innocence claim as his "Ground One" for relief in the introduction to his amended petition, Cortez provides no further

argument or legal authority in support of this ground.  In his reply, Cortez clarifies for the first time that he is alleging actual innocence "primarily as a 'gateway' claim." Pet. Rep. at 8.[7]  Accordingly, this Court will address the claim as a gateway claim.

"To satisfy the *Schlup* standard, a claim of actual innocence must be both 'credible' and 'compelling.'" *Rivas*, 687 F.3d at 541 (citing *House v. Bell,* 547 U.S. 518, 521 (2006)).  A credible claim is one that is supported by "new reliable evidence." *Id.* (citing *Schlup*, 513 U.S. at 324).  "As long as the petitioner has presented *some* new reliable evidence, the court may proceed to the compelling prong of the claim, at which point the court's analysis is not limited to [new reliable] evidence but must be based on *all* the evidence, old and new." *Lopez v. Miller*, 915 F. Supp. 2d 373, 399 (E.D.N.Y. 2013) (emphases in original) (quoting *House*, 547 U.S. at 537 and *Rivas*, 687 F.3d at 542) (internal quotation marks omitted).  In order to present a compelling claim, a petitioner "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found

---

[7] In his Reply, Cortez clarifies that in his petition before the 440 Court, he did not alert the state court to the fact that he was raising actual innocence as a gateway claim as well as a freestanding claim until he submitted his reply papers.  Pet. Rep. at 27.  Similarly, before this Court, Cortez does not discuss actual innocence as a gateway claim until his reply.  *Id.* at 8.  "[A]s a general rule, a court does not consider arguments raised for the first time in a reply brief." *Holguin v. Lee*, No. 13-CV-1492 (LGS) (JLC), 2014 WL 5508331, at *4, n.4 (S.D.N.Y. Oct. 31, 2014), *adopted by*, 2016 WL 1030129 (Mar. 10, 2016).  Such a rule is meant to "deter[ ] the practice of raising new arguments on reply that the opposing party is unable to respond to." *Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 395 (S.D.N.Y. 2018).  Therefore, the Court should deem Cortez's actual innocence gateway claim to be waived.  Regardless, as discussed below, Cortez's gateway claim lacks merit.

petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 536–37 (quoting *Schlup*, 513 U.S. at 327).

The Court will next address whether Cortez's claim is both credible and compelling.

### a.   The Claim Appears to Be Credible

"A credible actual innocence claim must be supported with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Lopez*, 915 F. Supp. 2d at 399 (cleaned up). Cortez has presented the following pieces of allegedly new evidence: expert affidavits relating to the fingerprint evidence and surveillance footage allegedly showing Haughn leaving Woods's apartment building around the time of her murder. Pet. Rep. at 29–31.[8]

Contrary to respondent's assertion that this evidence is not new, *see* Resp. Opp. at 46, 59, the Court considers the evidence "new" for actual innocence purposes because it was not presented at trial. *See Rivas*, 687 F.3d at 543 ("new evidence" is "evidence not heard by the jury"). In evaluating whether the new evidence is reliable, the court "is not bound by the rules of admissibility that would govern at trial," *Schlup*, 513 U.S. at 328, but instead, it "must determine the reliability

---

[8] In discussing his actual innocence claim in his reply, Cortez includes allegations that the hairs found "clutched" in Woods's hands were human hairs that did not belong to Cortez, and DNA testing will reveal as much. He also asserts that he did not testify at trial to leaving a bloody fingerprint. Pet. Rep. at 29–30. First, neither one of these pieces of evidence is new (nor does Cortez appear to suggest they are). Second, as discussed further below, neither of these pieces of evidence is strong enough to make Cortez's claim compelling.

of *all* the new evidence [Cortez] has submitted, both admissible and inadmissible, by considering it both on its own merits and, where appropriate, in light of the pre-existing evidence in the record." *Lopez*, 915 F. Supp. 2d at 400–01 (cleaned up).

In his petition to the 440 Court, Cortez provided opinions from a number of forensic experts who allegedly demonstrated the inadequacy of the fingerprint evidence.  RA at 1267.  The experts, who all specialize in either blood splatter analysis or fingerprints, shed doubt on whether the fingerprint was actually made in blood.  Dkt. 2-9 at 76–103.[9]  Notably, one expert, Kenneth Moses, had been contacted by Florio for fingerprint comparison during the trial and had confirmed the identification of the print, but was unable to confirm if the print was in blood without seeing the original sheet rock.  Affidavit of Kenneth Moses dated October 27, 2015 ("Moses Aff."), Dkt. No.2-9 at 76, ¶ 3.  He further stated that he had never heard back from Florio, neither was he paid.  *Id.* ¶ 4.  Moses's qualifications include 45 years of work experience in forensic sciences including: working in private practice in San Francisco; starting automated fingerprint systems at the California Department of Justice; serving as an expert in state and federal court in over 800 cases; and he has numerous professional affiliations.  *Id.* ¶ 2.

Cortez also included the affidavit of Dr. Ralph Norman Haber and Dr. Lyn Haber, who opined: "there is no evidence of a friction ridge impression made in either wet or dry blood present in the latent partial print identified by the state

---

[9] All of these expert affidavits are included in one file found at Docket Number 2-9 and the page numbers refer to the pagination on ECF.

examiner as belonging to Mr. Paul Cortez." Affidavit of Norman and Lyn Haber dated October 15, 2015, at, Dkt. No. 2-9, at 86. Drs. Haber went on to say, "BEFORE the blood spattered in that location." *Id.* (emphasis in original). Drs. Haber are both PhDs and their credentials include identification matters for the legal profession since 1980 and specializing in the evaluation of research and practice of forensic identifications. *Id.* at 84.

Next, latent Print Specialist Michael Sinke concluded that the "blood has the appearance of being dropped at the location after the latent print." Affidavit of Michael Sinke dated September 23, 2015, Dkt. No. 2-9 at 81, ¶ 25. Sinke's credentials include conducting exams and reviews since 1976 and working in the forensic science division of the Michigan state police. *Id.* ¶¶ 5–6.

Finally, forensic chemist Heather Harris stated that the chemical amido black could react to other human body fluids or other proteins and thus it is not conclusive that a print was made in blood. Affidavit of Heather Harris dated February 5, 2016, Dkt. No. 2-9 at 93, ¶ 10. Harris has worked in forensic chemistry for over 15 years, as a forensic chemistry consultant and an adjunct professor of forensics. *Id.* at 92, ¶ 1, 93, ¶ 14.

Because these are sworn affidavits by experts in their respective fields, the Court finds them to be reliable pieces of evidence. *See, e.g., Rivas*, 687 F.3d at 546 (qualified expert's testimony found credible); *Bryant*, 725 F. App'x at 73–74 (same).

In addition, Cortez offered video surveillance that was not shown to the jury.[10]  He alleges that both his counsel and the prosecution were in possession of the surveillance, which demonstrates that Haughn was leaving Woods's apartment immediately after she was murdered.  Am. Pet. at 2.  Specifically, Cortez alleges that the video shows Haughn "leaving the scene of the crime at a timestamped 6:37:52 p.m., thirteen minutes after the homicide took place."  Pet. Rep. at 28.

Respondent contends that the timestamp on the video is not accurate.  Resp. Opp. at 58.  It states that the "clips recorded by that camera were saved on a computer hard drive," and that "the notation 18'37"52 in the filename undoubtedly indicates the time that the file was *saved* to the computer hard drive, as opposed to the precise time that the footage was *filmed*."  Resp. Opp. at 60 (emphasis in original).  Therefore, respondent argues, "[t]here could have been a lag of a few minutes between when the video was recorded and the file was saved."  *Id*.  While respondent's theory is a possibility, it is just that, a possibility.  Neither side has presented evidence to demonstrate the accuracy of the file name, when it was created, and whether it can be read to be a reliable timestamp.

Still, respondent does not dispute that the video shows Haughn leaving the apartment building at some uncertain time.  Resp. Opp. at 58–65.  Accordingly, while the Court cannot determine whether the file name is an accurate time stamp,

---

[10] The surveillance video was provided to the Court by respondent.  After counsel for Cortez failed to comply with multiple court orders (*see* Dkt. Nos. 50, 55, and 56) directing her to provide the surveillance referred to in Cortez's briefing, the Court contacted counsel for respondent to provide a copy.

the video appears to be reliable.  Because Cortez has provided new evidence that is reliable, his actual innocence gateway claim can be considered credible.

### b.    The Claim is Not Compelling

An actual innocence claim under *Schlup* is compelling if the petitioner demonstrates that "'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" *Rivas,* 687 F.3d at 518 (quoting *House,* 547 U.S. at 538).  The "standard is 'demanding and permits review only in the extraordinary case.'" *Id.* at 542 (quoting *House,* 547 U.S. at 538).

The Court concludes that considering both the new fingerprint analysis and the new surveillance evidence, in conjunction with the evidence presented at trial, it is not more likely than not that any reasonable juror would have reasonable doubt. As such, Cortez has not met the high standard set by *Schlup*.  Even assuming a reasonable juror would find the new fingerprint evidence credible—that there is a possibility that Cortez's print was left on the wall at some time before Woods's murder—as the 440 Court observed, it does not overcome the remaining evidence. At best, the jury would find the fingerprint evidence to be inconclusive, which is insufficient under *Schlup.  See, e.g., Cosey v. Lilley*, 62 F.4th 74, 85 (2d Cir. 2023) (where forensic evidence is inconclusive, evidence does not "establish[] a credible and compelling claim of actual innocence—even when considered alongside the other evidence").

Similarly, even assuming the surveillance video and the timestamp is accurate, that Haughn was seen walking away from the apartment building at 6:37 p.m. is the most it can demonstrate. The prosecution hypothesized at trial that the time Woods was killed was sometime between 6:20 p.m. and 6:35 p.m. Tr. at 1980. Demonstrating that Haughn was walking away from the building at 6:37 p.m. is insufficient to refute the prosecution's timeline. When viewed in conjunction with the evidence presented at trial, and in particular, the cell phone records, journal entries, and boot print, the new evidence is insufficient to find Cortez's claim compelling.

Notably, both of these theories—that the fingerprint was left behind sometime before and that Haughn was in the apartment at the time of the murder—were presented to the jury by Cortez's counsel. *Id.* at 1895, 1903–1904. The jurors at that time did not have a reasonable doubt and so the Court cannot now say that they would. While the claim may be credible, it does not "thoroughly undermine[] the evidence supporting the jury's verdict." *Rivas,* 687 F.3d at 543.

Cortez cites to the Supreme Court's decision in *House v. Bell* as support for his actual innocence claim. Pet. Rep. at 28. In that case, as here, blood evidence presented at the habeas stage created questions about the prosecution's theory and the Supreme Court found that "reasonable jurors" would be prevented "from placing significant reliance on the blood evidence." *House*, 547 U.S. at 547. However, petitioner in that case presented DNA testing that contradicted the prosecution's main theory of motivation and which directly pointed to the other suspect in that

case. *See id.* at 541.  Here, while Cortez has attempted to cast doubt on the fingerprint evidence, the surveillance evidence is not enough to do so.  Because the exact time Haughn left the apartment and the exact time Woods were murdered were not established at trial, the surveillance evidence does not contradict one of the prosecution's main theories, as it did in *House.*

The inquiry under *Schlup*

> requires a holistic judgment about all the evidence, . . . and its likely effect on reasonable jurors applying the reasonable-doubt standard. . . . the inquiry does not turn on discrete findings regarding disputed points of fact, and [i]t is not the district court's independent judgment as to whether reasonable doubt exists.

*House*, 547 U.S. at 539–40 (citation omitted).  Following this standard, Cortez has not presented a compelling claim of actual innocence.[11]

### 2.    Ineffective Assistance of Counsel Claims

Cortez makes two ineffective assistance of counsel claims: the first based on his counsels' alleged conflicts and the second based on counsels' performance.  As discussed below, Cortez's ineffective assistance of counsel claims are exhausted and not procedurally barred, but without merit.

---

[11] In his reply, Cortez petitions this Court for an evidentiary hearing.  Pet. Rep. at 62.  However, as discussed above, because this Court finds that even if the new evidence Cortez has presented was viewed in the light most favorable to him—the fingerprint evidence being inconclusive and the surveillance video casting doubt on the prosecution's timeline—he still would not be entitled to relief, and thus a hearing is not warranted.

### a.  No Procedural Bar to Review

Cortez presented his ineffective assistance of counsel claims at every relevant level in state court, the claims were denied on the merits, and do not appear to have been denied because of a state procedural rule.[12]  Cortez raised the claims in both his direct appeal to the Appellate Division and the Court of Appeals and the 440 Court.  The Appellate Division denied his appeal, finding that at most, only one of his attorneys was conflicted and Cortez had submitted a valid waiver of that conflict.  *People v. Cortez*, 85 A.D.3d 409, 409–10 (1st Dep't 2011).  In addition, the Appellate Division observed that to the extent the conflicts "operated on the defense" and Cortez was also making "general ineffective assistance of counsel claims, they are unreviewable on direct appeal, and thus procedurally defective, because they involve matters outside the record."  *Id.*

Similarly, as Chief Judge Lippman found in his concurrence, although Cortez's waiver of the conflict with Florio was inadequate, there was no evidence to demonstrate that Florio's conflict affected her performance and so the "conflict-based ineffective assistance claim, as it [was] now presented, must fail."  *Cortez*, 4 N.E.3d at 957 (Lippman, C.J., concurring).  Finally, the 440 Court decided (and clarified upon reargument) that the Court of Appeals had decided the conflict question on the merits and thus did not need to revisit it.  Rearg. Dec. at 5.  The 440

---

[12]  Although Cortez did not raise the substantive ineffective assistance of counsel claim to the Court of Appeals, as the Appellate Division noted, this claim is unreviewable on direct appeal because it involves matters outside the record. *People v. Cortez*, 85 A.D.3d 409, 410 (1st Dep't 2011).  Cortez appropriately raised it in his motion before the 440 Court.

Court did evaluate the substantive ineffective assistance of counsel claim and determined that Cortez had "failed to make the requisite showing that he was denied the effective assistance of counsel as guaranteed by the Federal and State Constitutions." RA at 1283. Accordingly, both of Cortez's ineffective assistance of counsel claims have been decided on the merits by the state courts for purposes of § 2254.

Respondent argues in generalities that Cortez's claims are procedurally barred. First, respondent contends that Cortez's claim that Miranda suffered a conflict of interest is barred by procedural default because Cortez did not pursue the claim on appeal to New York's highest court. Resp. Mem. at 70. This contention is without merit as Cortez did, in fact, pursue his claim against Miranda in his petition before the Court of Appeals. *See* RA at 1124–25.

As to the remaining ineffective assistance of counsel claims, respondent points to language in the 440 Court's opinion that reads: "[a]ll other issues, other than those raised in the context of the defendant's actual innocence claim or ineffective assistance of counsel claim, which were record-based and/or addressed in appellate litigation, and in [Cortez's] previous 440 motion, are mandatorily and discretionarily barred." RA at 1264. Respondent argues that the only issue the 440 Court set out to evaluate related to the fingerprint evidence because the 440 Court concluded: "[i]n sum, the previous CPL § 440 motion, the First Department, and Court of Appeals rulings have all cleared the way for a limited decision on the confined issue of whether studies published after [Cortez's] trial bear on the claim

34

that defense counsel were ineffective for failing to pursue a line of defense regarding fingerprint evidence more aggressively." RA at 1264.  Respondent contends that this means that the only claim that was not procedurally barred was that relating to the fingerprint evidence.  Resp. Opp. at 71–72.  However, the 440 Court did in fact evaluate counsels' performance beyond the fingerprint evidence, *see* RA 1279–83, and did not explain why the rest of the claim was procedurally barred, if it was, in fact, concluding as much.  Nor did the 440 Court in reargument specify what procedural bar, if any, blocked the claim from being considered on the merits.

In sum, the Court interprets these claims as having been decided on the merits.  *See, e.g., Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits.").  Accordingly, the ineffective assistance of counsel claims are not procedurally barred, have been exhausted, and will be reviewed pursuant to AEDPA's standard of review.

### b.    Standard for Claims of Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a petitioner must satisfy the standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984).  To do so, he must "(1) show that his counsel's representation fell below an objective standard of reasonableness and (2) affirmatively prove prejudice."  *United States v. Rosa,* 666 F. App'x 42, 44 (2d Cir. 2016) (citing *Strickland,* 466 U.S. at 687–88).

"*Strickland*'s two-prong test applies equally to claims of ineffective assistance of appellate counsel on a petitioner's first appeal as of right." *Aparicio,* 269 F.3d at 95.

Under *Strickland's* first prong, the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. In evaluating counsel's effectiveness, courts must assess the case from the viewpoint of the attorney at the time of the challenged conduct or omission. *See Lockhart v. Fretwell,* 506 U.S. 364, 371–72 (1993). Rather than strictly scrutinizing an attorney's every decision, courts must focus on whether counsel's behavior was so unreasonable as to represent a "breakdown in the adversarial process that our system counts on to produce just results." *Strickland,* 466 U.S. at 696. "[T]he record must demonstrate that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment.'" *Wilson v. Mazzuca,* 570 F.3d 490, 502 (2d Cir. 2009) (quoting *Strickland,* 466 U.S. at 687).

Under *Strickland*'s second prong, a petitioner must establish that he was prejudiced as a result of counsel's performance. To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Lynch v. Dolce,* 789 F.3d 303, 311 (2d Cir. 2015) (to demonstrate prejudice resulting from the allegedly deficient representation, "a petitioner must show that, had his claim been raised on appeal,

there is a reasonable probability that it would have succeeded before the state's highest court").

In the context of the AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Richter,* 562 U.S. at 101. Given that the "standards created by *Strickland* and § 2254(d) are both 'highly deferential,' . . . when the two apply in tandem, review is 'doubly' so." *Id.* at 105 (quoting *Knowles v. Mirzayance,* 556 U.S. 111, 123 (2009). Put differently, this Court must "take a 'highly deferential' look at counsel's performance, through the 'deferential lens of § 2254(d).'" *Matthews v. Raymond,* 562 F. App'x 43, 44 (2d Cir. 2014) (quoting *Cullen v. Pinholster,* 563 U.S. 170, 181 (2011)).

### c.   Application

#### i.   Conflict-Based Ineffective Assistance of Counsel Claim

Cortez asserts that his trial counsel was ineffective because both lawyers were operating under a conflict during the course of his trial in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the U.S. Constitution. Am. Pet. at 27. Cortez contends that the state court erred when it found the conflicts, although present and although not adequately waived by Cortez, did not prejudice him. *Id.* at 31. Cortez argues that the 440 Court's decision was "contrary to, and involved an unreasonable application of federal law and predicated its

decision on determinations of factual issues which were unreasonable in light of the evidence presented to it." *Id.* at 32.

The Sixth Amendment right to counsel includes the "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). Two types of conflicts of interest are relevant here: potential and actual. A potential conflict of interest will be found where "the interests of the defendant may place the attorney under inconsistent duties at some time in the future . . . and violate the Sixth Amendment when they prejudice . . . the defendant." *Ventry v. United States*, 539 F.3d 102, 111 (2d Cir. 2008) (internal citations omitted). "Actual conflicts occur when the interests of a defendant and his attorney diverge with respect to a material factual or legal issue or to a course of action, and violate the Sixth Amendment when counsel's representation of the client is adversely affected by the existence of the conflict." *Id.* (citations and alterations omitted); *see also Eisemann v. Herbert*, 401 F.3d 102, 107 (2d Cir. 2005) ("An actual conflict, for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.") (quoting *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002)) (internal quotation marks omitted). Where there is an actual conflict, prejudice is presumed for purposes of establishing an ineffective assistance of counsel claim. *Eisemann*, 401 F.3d at 107 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)).

Importantly, here, the "presumption of prejudice has not been extended beyond the context of 'multiple concurrent representation,' where the conflict arises

out of one lawyer's representation of multiple clients facing the same charges." *Bethea v. Walsh*, No. 09-CV-5037 (NGG), 2016 WL 258639, at *28 (E.D.N.Y. Jan. 19, 2016) (quoting *Mickens*, 535 U.S. at 174–75). Taking into consideration that relief is only available under "§ 2254(d)(l)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question," *White*, 572 U.S. at 427 (quoting *Harrington*, 562 U.S. at 103), the standard as laid out in *Mickens* does not apply here. Therefore, "conflict-of-interest claims involving counsel under indictment or investigation must satisfy the *Strickland* standard for proving prejudice . . . . [and] [t]he court therefore will determine whether: (1) an actual conflict existed; (2) the alleged conflict had an adverse effect on performance; and (3) the alleged conflict prejudiced Petitioner's case." *Bethea,* 2016 WL 258639, at *28. In order to succeed then, Cortez must demonstrate that both an actual conflict existed, the conflict had an adverse effect on counsels' performance, and but for that performance, the result of his proceeding would have been different.

With regard to Miranda, Cortez alleges that because she was held in contempt for missing the first two days of his trial, it was not in her interest to do anything to further displease the Court and as such, she could not advise him on the best course of action with regard to her co-counsel Florio, who had just been indicted on a narcotics charge. Am. Pet. at 30 n.27. In his concurrence, Chief Judge Lippman opined that he had "serious reason to doubt whether [Miranda's] advice . . .[was] the product of independent and disinterested professional judgment." *Cortez*,

4 N.E.3d at 956 (Lippman, C.J., concurring).   However, a contempt cite does not rise

to the level of a "conflict" as contemplated by Supreme Court precedent relating to

counsel conflicts or even the type of conflicts analyzed by the Second Circuit—it is

neither a conflict of interest due to a concurrent representation (*see, e.g., Mickens*,

535 U.S. at 175), nor is it a conflict due to a criminal charge by the same

prosecuting agency (*see, e.g., United States v. Armienti*, 313 F.3d 807, 813 (2d Cir.

2002)).   Accordingly, Miranda did not labor under any conflict.

By contrast, there is a clear record of a conflict for Florio.   As Cortez's trial

began, a New York County grand jury indicted Florio in connection with an

unrelated drug incident.   Am. Pet. at 19.   In evaluating Cortez's claim, as Chief

Judge Lippman explained, because Florio faced prosecution by the same office that

was concurrently prosecuting her client, "there was at least a potential conflict of

interest; it was entirely plausible that [Florio's] natural concern over how she would

be dealt with in her own case would inhibit the vigor of her opposition to her

prosecutor's case against her client."   Cortez, 4 N.E.3d at 953 (Lippman, C.J.,

concurring).   Chief Judge Lippman then went on to evaluate the trial court's waiver

inquiry pursuant to *People v. Gomberg*, 342 N.E.2d 550 (1975), and ultimately found

the inquiry lacking.   *Cortez*, 4 N.E.3d at 956 (Lippman, C.J., concurring).   Having

determined that Cortez had an unwaived conflict, he went on to evaluate whether

Cortez had made a showing that the conflict "operated on" his defense, and found

that he had not demonstrated that any failings on the part of Florio were a result of

her conflict, and the cases in New York "do not provide that such a connection may

be presumed." *Id.* at 957. Thus, Cortez's conflict-based ineffective assistance of counsel claim failed. The 440 Court did not revisit the conflict issue because it had "failed before the Court of Appeals." Rearg. Dec. at 5.

As to Florio's conflict, this Court finds no error in the state court's decision. Cortez has not demonstrated that there was some action she should have taken or some evidence that she should have presented that she failed to offer, and that this failure was a direct result of the pending criminal charge against her. "Prosecution or investigation by the same office, standing alone . . . is not grounds for finding an actual conflict." *Skinner v. Duncan*, No. 01-CV-6656 (DAB) (AJP), 2003 WL 21386032, at *44 (S.D.N.Y. June 17, 2003) (citing *Armienti*, 313 F.3d at 814), *adopted by* Order dated May 7, 2004, Dkt. No. 21. Accordingly, because Cortez has not established that any failings by Florio were a direct result of her indictment, the claim fails. *See, e.g., United States v. Blount*, 291 F.3d 201, 212 (2d Cir. 2002) (no Sixth Amendment violation where no demonstration that conflict caused counsel's failing).

### ii.      Substance-Based Ineffective Assistance of Counsel Claim

Apart from any conflicts, Cortez also claims that his trial counsel were ineffective because they failed to: (1) conduct expert review of blood evidence; (2) obtain DNA testing on human hairs found clutched in Woods's hands; (3) obtain expert review of the cell phone records to accurately interpret and explain the cell phone evidence to the jury; (4) interview key witnesses inculpating Haughn as the

perpetrator; and (5) highlight demonstrative evidence inculpating Haughn.  Am. Pet. at 40–56.

### (a)      Performance Prong Under *Strickland*

The 440 Court found that Cortez "failed to demonstrate a lack of meaningful representation in his case," and thus he did not meet the first prong in the *Strickland* analysis.  RA at 1280.  As discussed below, Cortez has demonstrated that the 440 Court unreasonably applied the *Strickland* performance prong as to the fingerprint evidence and the surveillance video, but reasonably applied it as to everything else.

### (1)      Fingerprint Evidence

Cortez contends that counsel was ineffective for failing to refute the "sole piece of physical evidence" linking him to the crime: "blood smears found on a piece of sheetrock cut out of [Woods's] bedroom wall," that the prosecution claimed was a handprint and more specifically, a bloody fingerprint matching Cortez's left index finger.  Am. Pet. 40–41.  Specifically, Cortez contends that Florio's attempts at challenging Detective Entenmann, who testified to seeing the fingerprint in blood, was "flummoxed" and "conflicted."  *Id.* at 42.  Neither did counsel properly question forensic examiner Alex Chacko, whose testimony, Cortez contends, did not fully support the prosecution's theory.  *Id.*  As noted above, in his petition to the 440 Court, Cortez provided opinions from forensic experts who demonstrated the inadequacy of the fingerprint evidence.  RA at 1267.  It is worth reiterating that one expert, Kenneth Moses, was contacted by Florio for fingerprint comparison during

the trial and confirmed the identification of the print, but was unable to confirm if the print was "bloody," and stated that he had never heard back from Florio, neither was he paid.  Moses Aff. ¶¶ 3–4.

With respect to the fingerprint evidence, the 440 Court determined that Cortez did not warrant an evidentiary hearing, because it was "able to determine, from all of the documents, court file, trial transcript and exhibits, that defense counsel employed a strategy to minimize the value, and emphasize the lack of physical evidence, while pointing to David Haughn as the culprit."  RA at 1277–78.  The 440 Court went on to observe that it was "quite possible . . . that defense counsel chose not to call certain experts because perhaps they would not have supported" their theory of the case.  *Id.* at 1279.  Thus, the 440 Court found that counsels' decision not to present this expert testimony did not meet the first prong of *Strickland.  Id.* at 1282.

However, it is apparent from the record that Cortez's counsel were trying to present evidence that disputed the prosecution's contention that the fingerprint was made in blood and belonged to Cortez.  The appropriate inquiry "is whether counsel's failure to investigate the option, consider its strategic merits and demerits, and then make an informed decision about it fell below an objective standard of reasonableness."  *Lopez v. Greiner*, 323 F. Supp. 2d 456, 476 (S.D.N.Y. 2004).  Moses stated in a sworn affidavit that he was contacted to compare the print found on the wall against Cortez's prints, and he told Florio that the images "suggest the presence of more than one fingerprint," and that counsel should have

43

the actual sheetrock examined.  Pet Mem. at 46.  Questioning the fingerprint evidence was part of the defense, and counsels' summation aligns with Moses's findings.  *See* Tr. at 1933–35 (Miranda's summation: "[t]here is no proof beyond a reasonable doubt that that [*sic*] was a blood print.").

It follows that a reasonably competent New York attorney would have continued to work with Moses or otherwise explored the fingerprint evidence in a fashion that Cortez's counsel did not.  Further, the 440 Court's proffer of a hypothetical justification for why counsel may have not called these experts to testify, as they may not have supported counsels' theory of the case that Haughn was the killer, was an unreasonable application of *Strickland* as it ignored the arguments actually put forward by counsel at trial.  *See Greiner*, 323 F. Supp. 2d at 477–78 (state court unreasonably applied *Strickland* where inquiry was not whether counsel met duty to make reasonable investigations, but instead whether hypothetical, competent attorney had strategic reason not to investigate).

### (2)   Surveillance Video

Additionally, Cortez argues that his counsel failed to review the relevant photographs and surveillance footage that would have inculpated Haughn "as the true perpetrator."  Am. Pet. at 58.  Importantly, he alleges that counsel "received the video [surveillance] on the eve of trial . . . failed to review the footage, and thereafter failed to admit into evidence a video."  *Id.* at 4.  He goes on to contend that "the failure to introduce into evidence the videotape exculpating [Cortez] 'was not due to strategic considerations,' but because until well beyond the first day of trial, and in fact not until Cortez's current counsel told them in 2016, Florio and

Miranda were unaware it had anything of interest on it, because they had never even opened it." *Id.* at 37. The affidavit of Toni Marie Angeli dated August 27, 2017 that Cortez attached to his motion before the 440 Court states that Florio was "astounded to learn that there was a surveillance video that depicted Haughn leaving." Dkt. 2-9 at 54, ¶ 7.

As with the fingerprint evidence, it was unreasonable for counsel to have failed to introduce the surveillance evidence, or at the very least, been aware of what it depicted. As discussed above, counsels' defense strategy was to paint Haughn as the suspect, so for counsel to have even been unaware of a surveillance video that could support their theory cannot be considered effective assistance. *See, e.g., Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.") (citations omitted); *see also Williams v. Taylor*, 529 U.S. 362, 396 (2000) ("Whether or not those omissions were sufficiently prejudicial to have affected the outcome . . . they clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation").

### (3)    DNA Testing

Next, Cortez contends that his counsel failed to obtain DNA testing. Am. Pet. at 50.[13] He argues that "numerous hairs, some with the roots still attached, were

---

[13] Respondent contends that Cortez never perfected his appeal from the first motion for DNA testing, which he filed pursuant to § 440.30(1-a), and so this argument is procedurally barred. Resp. Opp. at 92 n.1. While it is true that Cortez did not raise the DNA testing claim on direct appeal, his current claim for DNA testing is part of his larger ineffective assistance of counsel claim. Accordingly, as with the entirety of the substantive ineffective assistance of counsel claim, which the Court views as

found entwined in the fingers of the decedent," and counsel was granted funds for a DNA expert, but no expert was ever hired to test the hair. *Id.* at 50. The evidence at trial established that none of the hairs that were in Woods's hand was similar to his own, so he argues that "counsel had no strategic basis for failing to subject the hairs" to DNA testing. *Id.* at 51.

The 440 Court, on reargument, clarified that it did not address DNA testing in its decision because the court had addressed the issue following Cortez's application in 2008, and Cortez "added nothing to the arguments which would merit revisiting the issue, much less coming to a different conclusion." Rearg. Dec. at 3. Specifically, the court decided in 2008 that because Cortez had the opportunity to have the DNA tested during trial, § 440.30 does not provide for a second opportunity. Moreover, even if Cortez had been granted an opportunity to obtain DNA testing, he had not demonstrated that there was "a reasonable probability that the results of the DNA testing he seeks would have resulted in a verdict more favorable to" him. RA at 704.

As respondent points out, Cortez's counsel used the fact that the hair had not been tested in their defense. Resp. Opp. at 91 (citing to Tr. at 1885, 1930–31). A "reasonably diligent counsel may draw a line when they have good reason to think

---

a mixed claim, it is not procedurally barred and the Court will consider the merits. *See, e.g., Anderson v. Lee*, 453 F. Supp. 3d 574, 583 (E.D.N.Y. 2020) ("New York courts have recognized that in some cases where a defendant's ineffective assistance of trial counsel claim includes both on-the-record and off-the-record arguments, a § 440 motion is the only place that such a claim – referred to as a 'mixed claim' – can be raised.").

that further investigation would be a waste." *Rompilla v. Beard,* 545 U.S. 374, 383 (2005).  Here, not testing the DNA appears to have been a strategic decision counsel made and so the first prong of *Strickland* has not been met.  *See, e.g., Smith v. Edwards*, No. 98-CV-7962 (DLC), 2000 WL 709005, at *5 (S.D.N.Y. May 31, 2000) (ineffective assistance of counsel claim based on trial counsel's failure to arrange DNA testing denied); *see also Johnson v. People of State of New York*, No. 02-CV-3752, 2003 WL 23198785, at *15 (E.D.N.Y. Nov. 5, 2003) ("The record is devoid of any request by defense counsel for additional forensic testing or claim of prejudice on the ground that no further examinations were done.  Strategically this position made sense since it was likely that testing would have revealed adverse evidence.").

### (4)    Cell Phone Records

Cortez argues that his counsel failed to obtain an expert to review the cell phone records, which were a "key circumstantial component to the prosecution's case."  Am. Pet. at 51.  Respondent contends that the "cell site evidence was irrefutable" and that Cortez "admitted at trial that he was in the vicinity of Woods's apartment at the time of the murder."  Resp. Opp. at 92.

As with the DNA testing, the 440 Court reviewed Cortez's claim that his counsel should have called certain experts, together, under the *Strickland* analysis.[14]   The 440 Court determined that any experts whom Cortez's counsel

---

[14] The 440 Court provided no discussion of the adequacy of counsel's performance as to the investigation of the cell phone records.  Still, Cortez did raise this issue before the 440 Court, *see* RA at 1068–69, so based on the 440 Court's decision of counsels' decision to call experts, generally, this Court finds the claim subject to the AEDPA. *See, e.g., Rosario v. Ercole*, 601 F.3d 118, 128 (2d Cir. 2010).  Regardless, Cortez's

failed to call were a result of a strategic decision made on their part, not due to any sort of incompetency. RA at 1279 ("counsel chose not to call certain experts because perhaps they would not have supported the defendant's theory of the case"). In fact, Cortez does not dispute the most important fact that comes from the cell phone records—that they place him in the vicinity of Woods's apartment at the time she was murdered. Am. Pet. at 53.

Any "'particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Strickland*, 466 U.S. at 691. Cortez has not demonstrated that his counsels' decision at trial on this point was unreasonable. *See e.g., McKelvey v. Bradt*, No. 13-CV-3527 (CM) (DF), 2016 WL 3681457, at *20 (S.D.N.Y. May 23, 2016) ("Counsel's strategic choice not to assert an alibi defense based on Petitioner's phone records . . . does not constitute deficient performance."), *adopted by* Dkt. No. 24 (July 6, 2016). Thus, Cortez has not met the first prong of *Strickland*.

### (5)   Witness Interviews

Cortez argues that his counsel failed to interview witnesses who were ear witnesses to the murder, witnesses who were at the scene of the murder, and witnesses who refuted the prosecution's theory of the case. Am. Pet. 53–57. The 440 Court found that while counsel's strategy was in the end not a winning one,

---

claim that he received ineffective assistance of counsel due to counsels' failure to investigate the cell phone records is without merit.

they did, nonetheless, have a strategy.  RA at 1279.  Although counsel did not call

Andrew Gold's fiancée, Donna Propp, the neighbor Brad Stewart, or the police

witnesses who could allegedly testify to the tumultuous nature of Woods's and

Haughn's relationship, counsel did call other witnesses and did cross-examine the

prosecution's witnesses.  *Id.* at 1278.

Attorneys enjoy "a strong presumption that [his or her] conduct falls within

the wide range of reasonable professional assistance" when making decisions with

respect to witnesses.  *Strickland,* 466 U.S. at 689.  "*Strickland* does not enact

Newton's third law for the presentation of evidence, requiring for every prosecution

expert an equal and opposite expert from the defense."  *Harrington*, 562 U.S. at 111.

"In many instances cross-examination will be sufficient to expose defects in an

expert's presentation.  When defense counsel does not have a solid case, the best

strategy can be to say that there is too much doubt about the State's theory for a

jury to convict."  *Beltran v. Keyser*, No. 15-CV-7201 (CBA), 2019 WL 2271360, at *9

(E.D.N.Y. May 28, 2019) (citation omitted).

As with the DNA and cell phone records, Cortez has not demonstrated that

his counsels' decision to call certain witnesses and not others was unreasonable or a

result of incompetency.  The 440 Court summarized in detail which witnesses

counsel called and their testimony.  RA at 1278.  Counsel had a clear strategy—

paint Haughn as the suspect and portray Cortez as "a soft-spoken, gentle, and

loving person . . . with no motive to kill."  *Id.*  The witnesses whom counsel called

supported that theory.  Cortez has not demonstrated that putting forward this

theory as opposed to another was unreasonable.  "[A] decision not to call a particular witness—'even one[ ] that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'" *Ortiz v. Barkley*, 558 F. Supp. 2d 444, 453 (S.D.N.Y. 2008) (citation omitted). Further, "[t]here is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington*, 562 U.S. at 109–10 (2011) (citation and quotations omitted).  "After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome.  *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.*

### (b)  Prejudice Prong Under *Strickland*

In determining that counsels' performance was not prejudicial, the 440 Court found that there was nothing before it "to suggest that [Cortez] could have presented a more colorable claim which would have more than likely prevailed at trial, th[a]n what which he did present through trial counsel."  RA at 1282.  This application of *Strickland* was not unreasonable.  RA at 1282.

To satisfy the prejudice prong, Cortez must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome, and

thus the chance of an alternate result must be substantial, not just conceivable."
*Waiters v. Lee*, 857 F.3d 466, 480 (2d Cir. 2017) (internal citations and quotation
omitted). "[I]n the context of suppression motions[, ] 'the defendant must also prove
that his Fourth Amendment claim is meritorious and that there is a reasonable
probability that the verdict would have been different absent the excludable
evidence in order to demonstrate actual prejudice.'" *Watson v. New York*, No. 07-
CV-1111 (RJS) (RLE), 2011 WL 4639812, at *2 (S.D.N.Y. Oct. 6, 2011) (citing
*Kimmelman*, 477 U.S. at 375). Moreover, where "a conviction is supported by
overwhelming evidence of guilt," prejudice will not be found. *Sepulveda v. Lee*, No.
11-CV-487 (CS) (JCM), 2015 WL 5703135, at *13 (S.D.N.Y. Sept. 28, 2015)
(quotation and citation omitted); *see Waiters*, 857 F.3d at 480 ("[A] verdict or
conclusion with ample record support is less likely to have been affected by the
errors of counsel than 'a verdict or conclusion only weakly supported by the record'"
(citation omitted)).

Here, the 440 Court found that the evidence of guilt was overwhelming and,
therefore, Cortez failed to satisfy the prejudice prong. RA at 1282. Cortez argues
that the fingerprint was the "sole piece of physical evidence" in support of the
prosecution's theory and that it carried the prosecution's case. Am. Pet. at 40–41.
To be sure, the prosecution did rely heavily on the fingerprint evidence in closing:
"[i]f you believe that's his fingerprint put there in her blood and you should believe
it, then that's it. The defendant is the killer." Tr. at 1966–67. Similarly, Cortez
argues that the surveillance video allegedly depicting Haughn leaving Woods's

51

apartment building immediately following her murder supports his theory that Haughn was in the apartment at the time Woods was killed.  Pl. Mem. at 62–63.

As discussed above, while this exact fingerprint evidence was not produced at trial and the surveillance video was not shown to the jury, counsel did put forward the theory that the print, while it might have belonged to Cortez, was made at some time before the murder, and their own theory of the timeline of the events on November 27, such that the jury already took these alternatives into account. Moreover, while Cortez argues that the surveillance video is unequivocal evidence against the prosecution's timeline, the Court does not agree.  The record contains evidence to support Cortez's conviction beyond the fingerprint and uncertain chronology of the surveillance video: the cell phone records still place Cortez near Woods's apartment during the time period in which she was killed, he stopped calling her around the time she was killed, his journal entries provided the motive, and a witness testified that Cortez owned the boot that fit the boot print made in blood.  "The law has long recognized that criminal intent may be proved by circumstantial evidence alone." *United States v. Heras*, 609 F.3d 101, 106 (2d Cir. 2010); *see also Lopez v. Superintendent of Five Points Corr. Facility*, No. 14-CV-4615 (RJS) (JLC), 2015 WL 1300030, at *17 (S.D.N.Y. Mar. 23, 2015) ("guilt beyond a reasonable doubt may be established entirely by circumstantial evidence") (citation omitted), *adopted by* 2015 WL 2408605 (May 20, 2015).

Neither do the remaining alleged failings, which did not satisfy the first *Strickland* prong, demonstrate prejudice.  Although the 440 Court did not appear to

explicitly apply a *Strickland* analysis to the claim that counsel was ineffective for failing to pursue the DNA evidence, it was reasonable for the court to conclude that even if the DNA had been tested, at best it would show hair belonging to someone other than Cortez.  Rearg. Dec. at 3.[15]  Such evidence would not cut against the other evidence and accordingly, this decision did not prejudice Cortez.

Similarly, the affidavit from cell phone expert Lawrence Daniels dated February 29, 2016 ("Daniels Aff."), presented to the 440 Court stated: "[b]ased on the information I reviewed in this case regarding the call detail records and the limited cell tower location records, it appears there is evidence that the cell phone attributed to Paul Cortez was using a cell tower located at [84th] Street."  Daniels Aff., Dkt. 2-9, at 2.[16]  This finding does not controvert the prosecution's theory at trial.  Tr. at 1975–76; *see also* PA 21 (demonstrating a series of attempted calls from the tower at 84th street).  Cortez contends that, contrary to the prosecution's theory, Daniels declared that the records he reviewed demonstrate that although there was a "voluminous calling pattern" between Cortez and Woods on the evening she was killed, the calls "consist[ ] almost entirely of calls which did *not* connect" to Woods's phone.  Daniels Aff. at 2 (emphasis in original).  However, the fact that the calls were not completed does not refute the prosecution's theory that Cortez had been

---

[15] Courts assess ineffective assistance of counsel claims subject to the AEDPA even when the state court "did not explicitly review the evidence under the *Strickland* standard."  *Rosario*, 601 F.3d at 128.  Further, "[c]onflating the two prongs of *Strickland* does not violate AEDPA."  *Id.*

[16] Daniels' affidavit refers to a cell tower at "184th" Street, not 84th Street.  Daniels Aff. at 2.  This appears to be a typographical error as Cortez's memorandum of law, where he refers to Daniels' affidavit, also referred to 84th street.  Am. Pet. at 53.

attempting to call Woods all evening up until the time of her death.  Cortez argues that these incomplete phone calls are a reflection of an inadvertent hit of a redial button or a speed dial button, Am. Pet. at 52, but he provides no authority for this assertion.  Daniels provided in his affidavit that "[h]ad I or another qualified expert been called to testify at trial, I would have interpreted the call details for Catherine Woods and Paul Cortez on November 27, 2005 and other days."  Daniels Aff. at 2. This might be true, but merely stating he would interpret the records as opposed to what those interpretations would yield falls far below the prejudice standard as laid out in *Strickland*.

Finally, Cortez has not demonstrated that the witnesses whom he suggests counsel should have called would have changed the outcome of the case.   For example, at most Donna Propp would have been able to confirm Andrew Gold's testimony.  Am. Pet. at 3.  But Propp, who only allegedly heard screams over the phone, was too far removed to be reliable.  Similarly, Brad Stewart stated to the police that he knocked on Woods's door at about 6:00 p.m. but there was no answer. *Id.* at 55.  However, as with Gold's testimony at trial, any testimony Stewart would have provided to the jury regarding when he knocked on the door of the apartment would be, at best, an estimate, and any testimony regarding his conversation with Haughn would likely be inadmissible hearsay.

In *Lopez v. Miller*, the court found that counsel's failure to call two witnesses who could have provided the petitioner with an alibi was prejudicial.  915 F. Supp. 2d. at 430.  Here, unlike in *Lopez*, Cortez is not alleging that counsel failed to call a

witness who would testify and provide him with an alibi.  While these uncalled individuals might have supported Cortez's case, it would not appear that they would have supported his case any further than the witnesses the prosecution did call. Accordingly, Cortez has not demonstrated prejudice in this regard either.

In any event, to warrant habeas relief, a petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.  Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698–99 (2002); *see Colon v. Sheahan*, No. 13-CV-6744 (PAC) (JCF), 2016 WL 3919643, at *8 (S.D.N.Y. Jan. 13, 2016) ("Even if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." (cleaned up)), *adopted by* 2016 WL 3926443 (July 14, 2016)).  Cortez has failed to meet this doubly deferential standard.  *See Waiters*, 857 F.3d at 477 n.20 ("the Supreme Court has indicated that double deference is appropriate when evaluating *Strickland* claims governed by § 2254(d)") (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

Ultimately, "[t]his is not a case where [the additional fingerprint evidence and surveillance video] would have so clearly 'alter[ed] the entire evidentiary picture' that the [] court's decision is indefensible" given the other evidence that supported his conviction. *Waiters*, 857 F.3d at 484 (citations omitted).  Instead,

given the record, the 440 Court reasonably concluded that the verdict would have been the same.  Because Cortez has not established that the 440 Court's decision to deny his ineffective assistance of counsel claim was an unreasonable application of *Strickland*, this claim is without merit.

### 3.  Prosecutorial Misconduct Claim

To constitute a due process violation, prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."  *Greer v. Miller,* 483 U.S. 756,765 (1987) (internal quotation marks and citations omitted).  A court evaluating a prosecutorial misconduct claim should thus consider the severity of the prosecution's conduct; the measures, if any, taken by the trial court to remedy any resulting prejudice; and the certainty of conviction absent the prosecutorial remarks.  *See United States v. Elias,* 285 F.3d 183, 190 (2d Cir. 2002); *United States v. Perez,* 144 F.3d 204, 210 (2d Cir. 1998) (citation omitted); *Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir. 1994).

Cortez alleges that the prosecutor told "explicit falsehoods to the jury."  Am. Pet. at 70.  He also argues that in its 440 briefing, the prosecutor stated that Cortez "swore under oath that he left a bloody fingerprint on the wall and is therefore precluded from making this argument."  *Id.* at 72.

Respondent first argues that Cortez's prosecutorial misconduct claim has not been exhausted and is thus procedurally barred.  Resp. Opp. at 101.  In his reply, Cortez responds that he did raise it in his motion to vacate pursuant to § 440.10.  Pet. Rep. at 54–58.  The 440 Court explained on reargument that "[a]ll other

issues, . . .which were record-based and/or addressed in appellate

litigation, . . . were determined to be mandatorily and discretionally barred." Rearg.

Dec. at 2. Cortez did not raise this claim on direct appeal. "New York law prohibits

review of a claim on collateral review when the defendant unjustifiably fails to raise

the claim on direct appeal." *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001) (citing

§ 440.10(2)(c)). Accordingly, Cortez's failure to raise his prosecutorial misconduct

claim on direct appeal renders it procedurally defaulted. *See, e.g., Johnson v.

Griffin*, No. 13-CV-4337 (MKB) (SMG), 2020 WL 13527134, at *10 (E.D.N.Y. Nov.

25, 2020), *adopted by* 2022 WL 3347771 (Aug. 12, 2022).

For completeness, the Court considers the merits of this claim. In that

regard, respondent contends that all of the prosecutor's comments to which Cortez

takes issue were "fair comment[s] on the evidence," genuine arguments to the court,

and there is no evidence that the prosecutor knowingly lied. Resp. Opp. at 102–04.

The Court agrees.

First, the prosecutor did not tell "explicit falsehoods to the jury." For

example, he said that Haughn left the apartment "sometime after six, we don't

know exactly the time." Am. Pet. at 70. Cortez alleges that the prosecutor disputed

the accuracy of the timestamps on the surveillance video and time reported by Gold

from his cell phone and cable box in spite of evidence adduced at trial by the

prosecution's own witnesses establishing their accuracy. *Id.* at 72. The exact time

Haughn left the apartment was not established at trial. Although the apartment

building's resident manager testified at trial that the time on the surveillance

camera updates using the internet on a computer, Tr. at 428, the accuracy was not established at trial. Thus, it was appropriate for the prosecution to cast doubt on the time on Gold's cell phone and cable box in order to support its theory of the case. Similarly, the file name on the surveillance video was not at that time confirmed to be a time stamp, and accordingly the prosecution had no reason to account for it.

Next, with regard to the prosecution's briefing before the 440 Court, the 440 opposition actually states explicitly: "[h]e swore under oath that he touched the wall with [Woods's] menstrual blood on his hands at a time before the murder." RA at 1210. At trial, Cortez's testimony indicated that he might have left a fingerprint in Woods's menstrual blood on the wall. Tr. at 1637–38, 1776. The conclusion the prosecution makes in its 440 brief is the type of advocacy that is permitted. *See Alvarez v. Conway*, No. 05-CV-3235 (NRB), 2005 WL 3434634, at *9 (S.D.N.Y. Dec.13, 2005) ("[A]s a general matter both the prosecution and defense are entitled to broad latitude in the inferences they may suggest to the jury during closing arguments.").

Finally, Cortez argues that the prosecution asserted that he "had filed a previous motion to vacate, which—had it been true—would have triggered several discretionary and mandatory procedural bars under New York State law." Pet Mem 74. Courts in this Circuit have stated that motions for DNA testing pursuant to § 440.30(1-a) are "akin to a section 440.10 motion to vacate." *Green v. Walsh*, No. 03-CV-908 (GBD) (DF), 2005 WL 937616, at *1 (S.D.N.Y. Apr. 22, 2005) (citing *McDonald v. Smith*, 2003 WL 22284131 (JBW) (E.D.N.Y. Aug. 21, 2003)). However,

it stated on reargument, the 440 Court "correctly characterized [Cortez's] previous 440 motion as a request for DNA testing."  Rearg. Dec. at 3.  Therefore, whether the prosecution was correct or incorrect in referring to the motion for DNA testing as a motion to vacate, the 440 Court characterized it accurately.  Even, if the prosecution was incorrect, this is not the sort of "egregious" conduct that meets the standard of a prosecutorial misconduct claim.

In sum, the prosecution's remarks, both at trial and in briefing, appear to be "grounded, at least in part, in what [he] perceived the evidence to be." *Bell v. Griffin*, No. 11-CV-6175 (MAT), 2012 WL 1565632, at *7 (W.D.N.Y. May 2, 2012). Courts in this Circuit "recognize[ ] as such a firmly established and regularly followed rule" that "a challenge to the prosecutor's summation remarks must be preserved by a specific objection." *Sims v. Ercole*, No. 09-CV-4398 (RWS), 2010 WL 1685434, at *7 (S.D.N.Y. Apr. 23, 2010); *see also Vargas v. Keane*, 86 F.3d 1273, 1280 (2d Cir. 1996).  None of what Cortez has alleged amounts to a demonstration that the prosecution "engaged in conduct so egregious that it rendered the trial fundamentally unfair." *Branch v. Marshall*, No. 08-CV-8381 (PKC) (JLC), 2010 WL 5158632, at *14 (S.D.N.Y. Oct. 12, 2010), *adopted by* 2010 WL 5158633 (Dec. 16, 2010).

## III. CONCLUSION

For the foregoing reasons, the petition should be denied.

## PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Order and Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Engelmayer, United States Courthouse, 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007.

Any requests for an extension of time for filing objections must be directed to Judge Engelmayer. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

Dated: May 5, 2023
New York, New York

_____
JAMES L. COTT
United States Magistrate Judge