UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAUL CORTEZ,

                                    Petitioner,

                        -v-

THOMAS GRIFFIN,

                                    Respondent.

18 Civ. 766 (PAE) (JLC)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Petitioner Paul Cortez was convicted in 2007 of second-degree murder and sentenced to 25 years to life in prison. His conviction arises from the killing of 21-year-old Catherine Woods on November 27, 2005, in her apartment on the Upper East Side of Manhattan. At the time of the murder, Cortez was Woods's ex-boyfriend, and Woods was living with her on-again, off-again boyfriend, David Haughn. At trial and during post-conviction proceedings, Cortez has maintained his innocence and pointed to Haughn as the true perpetrator.

Both men were demonstrably in the vicinity of the crime scene around the time of the murder. The prosecution's theory was that, after Haughn left the apartment sometime after 6 p.m. to retrieve his nearby-parked car to drive Woods to work, Cortez entered the apartment, killed Woods, and left; when Haughn returned, he found Woods dead. That theory was supported by varied evidence. It included calls, messages, journal entries, and behavior patterns by Cortez indicative of obsessiveness towards Woods; suspicious behavior and statements by Cortez after the murder; a bloody boot print at the scene said to match the Sketchers boots a friend saw Cortez wearing later that night; and a key piece of physical evidence—Cortez's fingerprint on the wall of the apartment that the prosecution contended had been made in

Woods's blood.  Cortez has argued, *inter alia*, that it was coincidence that he was near the apartment around the time of the murder; that the prosecution's timeline was flawed; and that his fingerprint had been left on the wall before Woods's murder and was not in her blood.

Cortez brought the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254, seeking vacatur of his conviction.  He claims constitutional errors largely arising from what he terms new evidence.  These are: (1) a surveillance video, produced to the defense in discovery, which Cortez contends can be interpreted to show Haughn leaving the apartment at a time after the murder took place; and (2) a series of newly produced expert affidavits, which Cortez argues his attorneys were ineffective to failing to secure, which he argues support that his fingerprint on the apartment wall was not in Woods's blood.  Cortez argues that this evidence establishes his actual innocence, and, had it been effectively used by his counsel at trial, could have changed the outcome.  Cortez made these or similar arguments on direct appeal and/or a motion for collateral relief under New York Criminal Procedure Law § 440.10.  The state courts, although critical of aspects of Cortez's trial representation, denied Cortez the relief he sought—vacatur.

Before this Court now is the May 5, 2023 Report and Recommendation of Magistrate Judge James L. Cott (the "Report").  The Report recommends that the Court deny Cortez's petition.  It centrally finds that Cortez has failed to clear the high bar necessary for this Court to disturb the state courts' resolution of Cortez's constitutional claims.

For the reasons that follow, the Court adopts the conclusion of—and, with limited exceptions, the analysis in—Judge Cott's characteristically thoughtful and thorough Report.  Consistent with the Report's recommendation, the Court denies Cortez's petition for relief.

## I.    Background

### A.    Factual Background[1]

The Court adopts the Report's detailed account of the facts and its chronicle of the trial, to which no party specifically objects. The following summary captures the facts necessary to evaluate the issues presented.

On November 27, 2005, Catherine Woods was murdered in the apartment she shared with Haughn near the corner of First Avenue and East 86th Street. *See* Trial Tr. 230, 788. Woods was a young aspiring dancer from the Midwest. She had moved to New York in 2002 during her senior year of high school. Trial Tr. 87–88. Woods had met Haughn in Ohio where Woods's parents lived. After they began dating, Haughn moved to New York to be closer to Woods. *Id.* at 30.

In New York, Woods met Cortez at a gym where he worked as a personal trainer. *Id.* at 31. Cortez was artistically inclined and was interested in acting and was the lead singer in a band, Monolith, for which he also wrote song lyrics. *Id.* at 1390, 1026–27, 1012. In 2004, Cortez and Woods began to date. During their relationship, they broke up and got back together several times. As of the murder, they were broken up. *See id.* at 1035.

Cortez spent the afternoon of November 27, 2005, shopping with a personal training client on the Upper East Side. *Id.* at 1036–42. At around 4 p.m., Cortez left his client on the corner of 82nd Street and Lexington Avenue. *Id.* at 1045.

Starting at 5 p.m., Cortez made a series of phone calls to Woods. Cell phone records show that the first call routed through a cell tower on East 105th Street, a few blocks away from

---

[1] The Court draws these facts from the Trial Transcript ("Tr."), submitted to the Court on a CD; the People's Appendices ("PA") from trial; and the post-conviction record contained in Respondent's Appendix ("RA"). *See* Dkt. 30, Exs. 1–7.

Cortez's apartment. *See* PA 21–22; Trial Tr. 587–600. Between 5:05 p.m. and 5:14 p.m., cell phone records show that Cortez attempted to call Woods seven times, although most lasted only a few seconds. PA 21, 22. These calls also routed through the cell tower on 105th Street. *See* PA 21. At 5:27 p.m., Cortez made another call to Woods that lasted one second and routed through a cell tower at East 86th Street and Madison Avenue. PA 21, 22. Between 5:36 and 5:56 p.m., Cortez made several more calls to Woods, although it is unclear if any connected; all routed through a cell tower located at 354 East 84th Street. PA 21, 22. Woods's apartment was two blocks north of this cell tower location.

The same day, Haughn had been with Woods in the apartment on 86th Street until some point—the precise time is disputed—after 6 p.m., when he went to retrieve his car from where it was parked on 87th Street, leaving the door to the apartment unlocked. Trial Tr. 830–36. On his way to the retrieve his car, Haughn stopped at a building on 87th Street, where he worked the night shift as a doorman, to retrieve a CD he had left there. While there, he talked to another doorman and to the building's superintendent. *Id.* at 831–32, 484–86.

At 6:33 p.m., Cortez made another call to Woods's phone, again lasting only one second and routed through the 354 East 84th Street cell tower. PA 21. That is the last time the cell records reflect Cortez attempting to call Woods.

After retrieving his car, Haughn drove it to the corner of 86th and First Avenue to wait for Woods, calling her to let her know he was waiting. Trial Tr. 833–35. After not getting an answer, Haughn buzzed the building; still hearing nothing from Woods, Haughn entered the building. *Id.* at 835. At the gate to the building—often left unlocked—a neighbor told Haughn that one of Haughn's dogs had been running down First Avenue and that he had just retrieved it. *Id.* at 835–37. Joined by the neighbor, Haughn continued upstairs to the apartment. He entered

4

through the unlocked door, and, approaching the entrance to the bedroom, saw the bed pushed up against the doorway. *Id.* at 838. In the bedroom, there was blood "everywhere" with things "all over the place." *Id.* at 838–39. Woods was lying in a pool of blood. *Id.* at 839. At 6:59 p.m., Haughn called 911. *Id.* at 260–65. During the call, he observed a boot-print on the bed sheets in blood, and told the 911 operator about it, guessing someone had been in the apartment. *Id.* at 840–41.

Police and paramedics arrived, turned Woods over, and revealed a "huge laceration" on her neck; she was pronounced dead. *Id.* at 135–36. The murder weapon has never been found. When police asked Haughn who might have committed the crime, he named "Paul" or "Paul Vincent" as someone who had been stalking Woods. *Id.* at 1161. Haughn provided the police with fingerprints, fingernail scrapings, and a DNA sample. *Id.* at 846–48. He was initially a suspect. Haughn cooperated with police, and after further investigation, police attention focused on Cortez.

Although Cortez never called Woods again, his cell phone records reflected a call to voicemail around 6:46 p.m. and two outgoing calls to other numbers around 6:50 p.m. on the night of the murder. The outgoing calls routed through a cell tower near 95th Street and First Avenue. He also made a call at 7:16 p.m. which routed through a cell tower near the 110th Street and Lexington Avenue subway stop; and calls at 7:55 p.m. and 7:57 p.m., which routed through the East 105th Street cell tower near Cortez's apartment. PA 21–22. That night, Cortez, uncharacteristically, did not show up for his band practice, scheduled for 6 p.m. He told a band member that he had overslept. *Id.* at 1002–04. Then, around 8 p.m., Cortez invited a friend to watch the Jets game at a nearby bar, where Cortez showed up wearing a black leather jacket,

jeans, and black boots. *Id.* at 1339–40. Cortez's friend identified the boots at trial as a Sketchers boot—a brand which matched the bloody boot prints on Woods's bed. *Id.* at 1346–47.

The morning of November 28, 2005, two police officers spoke to Cortez at his apartment. After speaking briefly at his apartment, Cortez agreed to accompany the officers to the precinct; there, he described his activities the previous day. Cortez maintains he told the police that, between the hours of 5 p.m. and 8 p.m. the day before, he had gone to get something to eat in Woods's neighborhood, called clients, and headed home. A detective who spoke with Cortez at the precinct testified at trial that Cortez reported his time with his client in the afternoon and the Jets game thereafter, but that he did not divulge his whereabouts or activities between 5:00 and 8:00 p.m. or his attempts to call Woods. *Id.* at 931–44. In a later written statement to police, Cortez did not mention having left his house between 5 p.m. and 8 p.m. that night. *See id.* at 1780–82. In his testimony at trial, Cortez added a detail he had not told police: that he had gone to a Starbucks in Woods's neighborhood during this time period. *See id.* at 1723.

Cortez was eventually charged with murder in the second degree.

### B.    State-Court Procedural History

#### 1.    Trial

On January 29, 2007, Cortez's trial in New York State Supreme Court in Manhattan began before the Honorable Carol Berkman.

##### a.  *The prosecution's case*

The prosecution painted Cortez as a volatile ex-boyfriend who had a history of erratic behavior regarding Woods and violent writings seemingly about her in his journal, and who was not taking their most recent break-up well.

Supporting this theory of motive, the prosecution adduced testimony about two unusual incidents, earlier in 2005, involving Cortez and Woods.

The first was testified to by Woods's father.  He recounted an incident in or around April 2005.  Trial Tr. 92.  "Out of the blue," the father received a call on his cell phone from a man calling himself Paul Cortez.  *Id.*  The father had not interacted before with Cortez, who appeared to have gotten the father's cell phone number from his daughter.  *Id.*  Cortez told Mr. Woods that the previous night he had been called to get Woods from the nightclub "Privilege"—a strip club where Woods, unbeknownst to her family, worked, to make extra money, *id.* at 99—because she had been drugged.  *Id.* at 92–93.  Cortez said he picked Woods up and took her to his apartment, where she became unresponsive, and then took her to the hospital.  *Id.* at 93.  Cortez told him his daughter was addicted to drugs and alcohol and involved in prostitution.  *Id.* at 94.  Although this account was inconsistent with the father's observations of his daughter, he thanked Cortez as a concerned father and said he would "deal with this," *Id.* at 95.

The father then called Privilege.  The person who answered did not know a "Catherine" or "Eva or Ava," apparently Woods's stage name.  *Id.* at 95–96.  Mr. Woods then called the hospital, but it did not have a record of Catherine to report.  *Id.*  The next day, Mr. Woods flew to New York and confronted Catherine at her apartment.  She appeared in good condition, *id.* at 96, and denied any involvement with drugs, alcohol, or prostitution, *id.* at 97.  She told her father she was "very upset" that Cortez had made these allegations and that Cortez had been "calling incessantly and calling at work to get her fired," and that Woods was going to get a restraining order against Cortez.  *Id.* at 97.  The father later again spoke to Cortez and told him Catherine had said his accusations were untrue.  He told Cortez his stated concerns were "a dead issue now."  *Id.* at 98.

The second episode was testified to by Haughn.  He recounted the only time he had met Cortez before the murder.  *Id.* at 803.  In spring or summer 2005, when Haughn was with Woods

in her apartment, someone buzzed the intercom. *Id.* After either Haughn or Woods answered,

Woods recognized the voice on the other end of the line, and told the speaker (who turned out to

be Cortez) to go away. *Id.* However, Haughn testified, Cortez kept buzzing, and Woods kept

telling him to go away. *Id.* at 803–04. After this persisted, Haughn told Woods he wanted to go

downstairs and confront the person who was buzzing, but Woods, who "seemed kind of upset"

about the prospect of Haughn doing so, several times told Haughn not to. Nevertheless, Haughn

left the apartment, passing in the hallway a person who he thought might be Cortez. *Id.* at 804.

Haughn then took a brief walk outside. When he returned to the apartment Woods was talking to

the person he had seen—Cortez. She told Haughn she needed to "take care of something," and

again seemed like she was upset at Cortez. *Id.* at 804, 878. When Cortez left the apartment, he

and Haughn spoke outside. Cortez told Haughn he had been seeing Woods and had slept with

her. *Id.* at 805–06. Cortez was calm and civil during this conversation. *See id.* When Haughn

got back to the apartment, however, Woods indicated she had been worried that something bad

would happen to Haughn and denied Cortez's allegations, calling him "crazy." *Id.* at 807.

     The prosecution also introduced excerpts from Cortez's journal. Some concerned other

ex-girlfriends; others concerned Woods. *See id.* at 1211. Among those that appeared to concern

Woods, or to be from the relevant time period, were the following.

     In late 2004, Cortez wrote a poem that he later admitted, in testimony, referenced Woods:

> There was a meaning I lost
> Wandering through the Gardens of Kamala
> A vision obscured by the presence of silk
> She walks through a naked doorway
> And touches her lips to mine
> Open and breathing deep and slow
> But she is not there –
> She learned to suck before she learned to love
> And she left before she came
> Spread eagled

and soaring behind
walls behind her eyes
Shut tight behind a nightmare
of lightning equine eyes
Blood red
and sharp as Dewar's shot
Straight through
The child she never knew
And even though lost
in a galloping trance
I see tears
behind her moan
and a shivering behind her smile
behind her back
a blade that roams
She wipes clean the shaft
that cuts her throat
and returns back to her dog
her shoes
her home
away from home somewhere
out in the Midwest
where boys are dirty
and girls are princesses,
and I, the breathless steed,
lay broken like a studded leather
belt unraveled across the bed
I have bushwhacked this twinkling
brush with death for one –
a thousand lifetimes, and only
now do I see the azure blue
mingled with white gold
twinkling through the brambles
This life will be my last
as I fade through these shackles
like a ghost.

*Id.* at 1556–58, 1560.

In an entry dated March 20, 2005, Cortez wrote:

I saved her from rape, but she still wanted to take the risk of stripping for money though she might be drugged and molested again. I tried all I could to make her heal and vanquish the demons that keep her self-abusing. She thought I betrayed her when I told her father of her nighttime secret life. I wanted to stop—I wanted her to stop so that she would heal and love me without boundary or pain. But she

would never stop.  It's like trying to stop the river's downward path in the summertime with your bare hands.  No, you must wait 'til the winter when nature's freeze grips that sultry flow to stillness.  I loved her more than the others, but I still could not keep her close. . . . I wake with sadness in my heart every day for the loss of Catherine Woods.

> Let her go
> She said she hates you
> She wants you out of her life
> So let her go
> Her journey is different than yours
> She must burn more than you
> Wanted her to
> You can't save her
> She doesn't want to be saved
> She doesn't understand you love
> She said she despises you
> Let her go
> You hurt her more than you loved her. . . .

*Id.* at 1224–25.

In an undated entry from some other point in the journal—which may or may not have been kept chronologically—Cortez wrote:

Beautiful Catherine, love of my life.  How can I make you understand this erotic subjugation to lusty men hurt you more than you know.  I see that you would rather choose them over me.  Maybe if I had money it would be different.  You would say you want independence, but you are more a slave to them than to me any day.  I hope some things I have said have meaning to you and help you quit the industry of selling skin.  Catherine, you are so much more than this, and what's crazy is that you don't see that you can quit being treated like a whore and still be independent.  Something in me still hopes and believes that your love for me will win in the end.  I don't want to be—I don't want to be with anyone else, just you, Catherine Woods.  Such a beautiful name too.  Maybe I'm just a fool to believe in you, but there is something in you that I see which is yet uncovered. . . . My beauty, the only reason I made myself distant is that it hurts so much to see you sleepless and being used by work, friends and your ex.  I think I have been understanding, and my love for you has endured so much anger, frustration and jealousy which I normally would not put up with.  It was for you that I've tried to look beyond these things and love.  But they keep creeping out, and I keep hurting you.  This is the second reason I've had—I have made myself distant.  I don't know why I'm writing.  Maybe I believe that you might keep me in your heart and—and quit the porn world and release your attachment to your ex.  Maybe you'll never understand my love for you.  All I know is that because my heart is . . . broken because we are not together.  You've always

been stronger at turning your feelings off and getting on with your life, but it's much harder for me. Everyone asks, What's wrong with you? It's because they see my sadness in my eyes. I am not saying I can't live without you or anything like that. I'm just heartbroken because I don't feel that we have to be apart. . . . I just need you to quit the sex for money life for good as well as your ex. Then our relationship can grow for real. Otherwise, it will always be a block. I will wait for you forever if possible because I believe you are my soulmate.

*Id.* at 1227–29.

In another undated entry, Cortez wrote:

Catherine turned out to be lying too. She was sleeping with David and the others the entire time she told me how she was true and in love with me. How easy it has been to compartmentalize our hearts from our actions, from our minds. As if I didn't really mean anything to her. How could I feel so much for her? I just wanted to find my soulmate lover. I just wanted this lonely and inadequate feeling to be gone. I want to succeed in something special, in someone special. I still must not lose hope. My true love exists somewhere. This is the last time.

*Id.* at 1229.

Finally, in an undated entry, the journal contained a song that Cortez testified he wrote

after Catherine's death. It reads:

This isn't real
She's still not there
Release the wheel
Your thoughts beware
Now pray and kneel
For the electric chair
Burns your brain
Insane!
While you were taken from the earth
My lonely soul sought nothing but dirt
Sanctify
The reasons why
I never wanted
For you to die
Hold me holy
Rest my mind
Cremate the pain
Inside!
Keep your silence
You must be true

11

> I only wanted
> To follow you
> The earth was lost
> The brimstone smell
> The ships have gone
> The fire swell
> The demons one
> Your bound for hell
> As Lucifer smiles
> Your soul's defiled
> I'm not the one
> Trapped in hell
> I can't believe
> I'm in this cell.

*Id.* at 1231–32, 1762.

The prosecution also introduced evidence of Cortez's movements the night of the murder, as recounted above. And it introduced Cortez's cell-phone records during the months leading to the murder. These showed, for example, that on October 25, 2005, a month before the murder, Cortez called Woods 47 times, and Woods called him back seven times. *Id.* at 582–83. On the basis of such evidence, the prosecution portrayed Cortez as obsessive. In summation, it noted that Cortez's pattern of sometimes incessantly calling Woods made it suspicious that he abruptly ceased calling her the day of her murder after the time of her death around 6:30 p.m. *See id.* at 1988. The prosecution argued, too, that the absence of calls past this time was suggestive, inasmuch as Cortez usually called Woods later at night and early in the morning, when Haughn was at work. *Id.* at 1989.

Several witnesses also attested to the "on again, off again" nature of the relationship between Woods and Cortez. *Id.* at 1034, 1355. A personal training client of Cortez's testified that, at "every session" during the six-week period that they trained together, Cortez would speak about Woods and describe being upset with her life choices; the client testified that this was the "dominant conversation" between them. *Id.* The client testified that, in November 2005,

12

according to Cortez, he and Woods had broken up but there seemed to be "the hope that they were getting back together[.]" *Id.* at 1035. Cortez seemed "very hurt" and like he was "a guy going through a really bad breakup[.]" *Id.* at 1035–36.

The prosecution also introduced evidence of Cortez's lack of an alibi around the time of the murder, his silence when interviewed about his whereabouts during the time of the murder, and his access to the apartment at the time of the murder, when cell phone records put him in the close vicinity of Woods's apartment.

Finally, the prosecution emphasized two items of physical evidence that tied Cortez to the murder scene. One was the bloody boot print on Woods's bed sheets that the prosecution connected to boots Cortez was described by a witness as wearing that night in the same size as those that made the print. *See id.* at 1753. The other was a "bloody fingerprint" of Cortez's on the wall of the apartment. In summation, the prosecution termed it "the most important piece of evidence in the case." *Id.* at 1949. The Court reviews the fingerprint evidence in greater detail, *infra*, in discussing Cortez's post-conviction attempt to undermine that evidence.

*b.  The defense's case*

The defense sought to cast Haughn as the killer, and Cortez as gentle and innocent. To this end, the defense, on the prosecution's case, developed evidence (1) from which it argued that Haughn was in the apartment at the time when a neighbor, Andrew Gold, testified he had heard screams while on the phone with his fiancée, *id.* at 1903; (2) that hairs found in the hands of the deceased Woods were blonde, consistent with Haughn's hair color, *see id.* at 77; and (3) that Cortez had not appeared on surveillance videos taken from a camera near Woods's apartment, *see id.* at 1984–85.

13

The defense also called several witnesses. Cortez himself testified that, in or around July 2005, Woods had told him that Haughn had gotten "really mad" and threw dishes on the floor of the apartment. *Id.* at 1570. Cortez testified when he spoke to Woods soon after and asked her what was going on, Woods indicated that she and Haughn had been fighting. *Id.* at 1572. Cortez also stated that around this time, Haughn called him from a blocked number asking things like "Where's my girl?" in a way that sounded upset and scared Cortez. *Id.* at 1572–74. Cortez also testified that, at another time, Woods told him that Haughn had hit her. *Id.* at 1824.

Cortez also attempted to neutralize some of the damaging entries from his journals that had been introduced on the prosecution's case. References to violence in these, he testified, did not concern Woods or any real woman, but were artistic expression, doodles, hard rock lyrics, or his attempts to explore a character's mindset for an upcoming audition. *See, e.g.*, *id.* at 1706 (describing a poem he wrote as "about the nature versus the city . . . love versus violence" and not containing any "intention of harming Catherine"); *id.* at 1559 (describing another poem as based on the character Kamala from Siddhartha and about a character on a spiritual quest).

The defense also called character witnesses. Cortez's mother and high school best friend attested to his honesty, generosity, and gentle nature. The high school friend, Will Acosta, described playing football and participating in musical theater productions like "Carousel" and "West Side Story" with Cortez. *Id.* at 1385. He testified that Cortez was "always writing" "dozens of journals" that contained lyrics or first-person entries from the perspective of characters he was auditioning to play. *Id.* at 1386. He testified that Cortez had long written dark or violent sounding lyrics or poems, but that these were not necessarily meant literally. *See id.* at 1388–89. Cortez's mom spoke of a visit to her, during her lunch break at work, about two weeks before Woods's murder, by Cortez and Woods. *Id.* at 1854.

14

The defense also noted that the prosecution had not offered certain physical evidence, including the murder weapon, *id.* at 59, and the boots Cortez allegedly owned that matched the prints on Woods's bedsheets, *id.* at 60. The defense also adduced evidence that the type of boot at issue was very popular, *id.* at 922–23, including in Cortez's size (10½). *See, e.g., id.* at 760–61.

The defense also pursued the theory that Cortez's fingerprint had been left in the apartment before Woods's murder, not in her blood the night she was killed. The prosecution's forensic witness, Alex Chacko, had testified that he had tested, for fingerprints, blood on the wall of Woods's bedroom, finding Cortez's print. *See id.* at 457–59. On cross-examination, defense counsel elicited the clarification that the testing he had conducted on the blood transfer could not authoritatively establish that Cortez's fingerprint was left in blood, as opposed to having been on the wall before the murder. *See id.* at 459. Consistent with that theory, Cortez testified that, before the day of the murder, he had likely touched every surface of the apartment. He suggested that he might have left a print after touching Woods's menstrual blood during sex. *Id.* at 1776–75.

### c. *The verdict and sentencing*

On February 15, 2007, a jury convicted Cortez of murder in the second degree. On March 23, 2007, Judge Berkman sentenced Cortez to 25 years' to life imprisonment.

### 2. **Cortez's First CPL 440 Motion**

On August 25, 2008, Cortez filed, before Judge Berkman, a motion under New York Criminal Procedure Law ("CPL") § 440. It sought, under § 440.30(1-a), an order authorizing DNA testing (or re-testing) of hair found in Woods's hands at the crime scene, fingernail scrapings, and what he alleged was a bloody knife found in Woods's apartment. *See* RA682–86.

On October 20, 2008, Judge Berkman denied the motion. She found that (1) Cortez had failed to exercise due diligence, because he had the opportunity to conduct DNA testing of this evidence before trial but did not do so, and (2) more importantly, that even the most favorable results of independent DNA testing would not have tended to undermine confidence in the verdict. RA 704–05. As to the latter conclusion, with respect to the hair and blood, the trial court reasoned that evidence of another person's hair or blood in the apartment would not have been meaningfully probative, because it would have established only that someone else had been in the apartment at some time. RA705. As to "the presence of someone else's DNA under [Woods's] fingernails," that, the trial court recognized, "would certainly be probative," but, it held, Woods had not articulated any "reason to believe that his 'independent' testing would find foreign DNA which the Office of the Chief Medical Examiner . . . did not." RA706. In any event, the court noted, DNA testing would not undermine the most central evidence of Cortez's guilt. It listed this as:

> his fingerprint in blood on the wall of the deceased's apartment, the evidence that he was in the vicinity at the time of the killing, his false exculpatory denial of his propinquity at the time, and his incessant telephone calls to the deceased which ceased at or about the time of her death. The evidence relating to defendant's diary and his shoe size (to which defendant refers in his motion) was relevant and probative, but the People never argued that either the diaries or defendant's shoe size was dispositive.

RA704–05.

Cortez filed a notice of appeal from this decision. However, he then requested and was granted a stay pending his direct appeal from his conviction. RA707.

### 3.    Cortez's Direct Appeal

#### a.    Appellate Division

On October 20, 2009, Cortez filed a direct appeal from his conviction to the Appellate Division, First Department. In his briefing there, Cortez made six arguments. The first three

related to his trial representation, by attorneys Laura Miranda, Esq., who was lead counsel, and

Dawn Florio, Esq., who handled forensic evidence. First, Cortez argued, both attorneys had been

subject to unwaivable conflicts. Florio had been indicted by the Manhattan District Attorney's

Office, the office prosecuting Cortez, for allegedly smuggling drugs to an incarcerated client (not

Cortez); Judge Berkman had conducted a pretrial hearing and examined Cortez as to this issue,

and Cortez had waived the conflict.[2] Miranda, counsel of record, had been held in contempt by

Judge Berkman for failing to appear during the first three days the trial had been scheduled to

start.[3] Second, Cortez argued, even if these conflicts were waivable, they had not been validly

waived. Third, Cortez argued, his defense counsel's representation had been ineffective. As

deficiencies in the representation, he noted his counsels' periodic tardiness or absence, their pre-

---

[2] *See* RA671–72. The hearing, pursuant to *People v. Gomberg*, 379 N.Y.S.2d 769 (1975), examined whether Cortez was knowingly choosing to continue with Florio as co-counsel in his case despite this potential conflict of interest. Judge Berkman questioned Cortez about the issue, including whether Miranda had spoken with him about the charge pending against Florio, and identified the potential for Florio to be "more interested in her own matter than" Cortez's. RA672. Judge Berkman confirmed with Cortez on the record that he was aware of the conflict and its potential to impact his representation and asked him if he wished to proceed with Florio as Miranda's co-counsel. Cortez responded: "Yes. I understand that. And she has not compromised this case on account of her own[.]" *Id.*

[3] Cortez's trial was scheduled to begin Monday, January 22, 2007. *See* 1/22/2007 Tr. 2. Miranda had told Judge Berkman the defense would not be ready by then, but the judge declined to adjourn the trial, finding the defense had had enough time to prepare. *See* 1/19/2007 Tr. 3–6. That day, Miranda did not appear, prompting the judge to issue an order to show cause, returnable the next day, why Miranda should not be held in contempt. 1/22/2007 Tr. 2. She adjourned the trial. The next day, Miranda again did not appear, but submitted an affidavit stating that she had to take care of her out-of-state mother. *See* 1/23/2007 Tr. 3–8. Judge Berkman adjourned the trial again to the next day, but issued an order holding Miranda in contempt and fining her $1,000. *Id.* at 8. The next day, January 24, 2007, Miranda again did not appear; the Court again adjourned the trial by one day. 1/24/2007 Tr. 2–4. On January 25, 2007, Miranda appeared (with counsel representing her on the contempt sanction); after colloquy with Judge Berkman, the trial commenced with jury selection. *See* 1/25/2007 Tr. at 19–21. Florio, although having participated at a hearing, had not to that point entered an appearance. *Id.* at 13–14. For avoidance of doubt, no part of the trial went forward without a defense counsel present.

trial statements in seeking adjournments that they were not prepared for trial and had not secured expert forensics reports, their asserted mishandling of forensic evidence concerning the fingerprint on Woods's apartment wall and their ineffectual questioning of a prosecution witness regarding that print, their failure to have blond hairs found on the victim's hands tested, and their asserted mishandling of the footprint evidence. Fourth, Cortez argued, excerpts of his journal were improperly admitted, as these were irrelevant and prejudicial. Fifth, Cortez argued, the trial court erred in admitting testimony from an unreliable prosecution witness, in precluding cross examination of this witness about her previous inability to identify Cortez, and in allowing certain prosecution arguments about that testimony in summation. Sixth, Cortez argued the prosecutions' summation contained "rampant" misconduct. RA1–69.

On June 2, 2011, the Appellate Division affirmed Cortez's conviction. *See People v. Cortez*, 85 A.D.3d 409 (1st Dep't 2011). It held that Florio's conflict had been validly waived and that Miranda's contempt citation did not give rise to a *per se* conflict. *Id*. at 409–10. It held that, to the extent that Cortez asserted either that these conflicts actually affected the attorneys' representation or otherwise claimed ineffective assistance of counsel, those arguments were not properly brought on direct appeal as they involved evidence outside the record. *Id*. at 410–11. The court also rejected Cortez's evidentiary challenges and his challenge to the prosecution's summation, although it termed portions of the latter "excessive." *Id*. at 411. In a concurring opinion, Judge Freedman criticized the prosecution for referring in summation to older journal entries as showing Cortez had become "increasingly hostile toward women"; that commentary, she stated, went "beyond fair comment on the evidence." *Id*. at 412 (Freedman, J., concurring).

   *b.   Court of Appeals*

Cortez then filed a petition for leave to appeal to the New York Court of Appeals, which was granted on July 17, 2012. *People v. Cortez*, 950 N.Y.S.2d 355 (2012). In his brief there, Cortez argued three main points while stating that he was preserving the balance. RA307. These were that: (1) he was denied a right to conflict-free representation because the trial court's waiver inquiry with respect to Florio was inadequate; (2) the deficient waiver inquiry constituted a "structural" or "mode of proceedings error" mandating reversal, and alternatively, Florio's conflict in fact prejudiced his defense; and (3) the trial court erred by admitting Cortez's older notebook entries without a limiting instruction. RA289–437.

In a summary opinion, the Court of Appeals affirmed. It stated only: "Defendant raise[d] no error warranting a reversal of his conviction." *People v. Cortez*, 981 N.Y.S.2d 651, 651 (2014). Two concurring opinions, however, were filed: one by Chief Judge Lippman, joined by Judges Graffeo and Smith; and one by Judge Abdus-Salaam, joined by Judges Read and Pigott.[4]

Chief Judge Lippman's concurrence faulted as inadequate the trial court's waiver inquiry into Florio's potential conflict. The court, he noted, relied heavily on Miranda to explicate for Cortez the risk of Florio's continued representation, which was problematic in that Miranda "had relied upon [Florio] to cover critical issues for the defense, most notably those involving the prosecution's potent forensic proof." *Id.* at 655. He wrote:

> [Miranda] would naturally have been reluctant to dispense with co-counsel's assistance mid-trial. And, having herself just been held in contempt by the court for delaying the trial, would not have been anxious to incur additional judicial displeasure by apprising her client in such a way as to make the substitution of co-counsel and additional delay, or her immediate assumption of representational responsibilities for which she was unprepared, likely.

---

[4] The seventh member of the Court of Appeals, Judge Rivera, did not participate in the appeal. *Cortez*, 981 N.Y.S.2d at 664–65.

*Id.* Nonetheless, despite finding that the colloquy between Cortez and Judge Berkman "does not provide the necessary assurance that [Florio's] conflict and its risks were understood and freely assumed," Judge Lippman concluded that co-counsel Florio's conflict was potential, not actual, and that the waiver procedure, although likely invalid, did not automatically require reversal. *Id.* at 654–56. To obtain relief on account of Florio's unwaived conflict, he wrote, Cortez needed to "show that the conflict operated on the defense," but the record on direct appeal "shed[] no light on the fact-sensitive question of whether any such deficiencies were traceable to conflict generated reticence." *Id.* at 656.

Chief Judge Lippman's concurrence also addressed the admission of certain entries from Cortez's journal discussing pre-Woods girlfriends. The prosecution had argued to the jury that these evidenced "a simmering misogynistic rage which, over time progressed in its intensity and expression from the realm of fantasy to enactment[]" via Woods's murder. *Id.* at 657. Because this evidence was attenuated from Woods's murder, he found it classic propensity evidence that showed a "predisposition to a kind of behavior." *Id.* at 657–58. "[W]hile it was not difficult to construct a superficially convincing narrative based on this propensity driven supposition, it is precisely such a carelessly constructed yet highly seductive narrative that the *Molinuex* doctrine [governing inadmissible propensity evidence] prudently excludes from a criminal trial." *Id.* at 658. But, Chief Judge Lippman went on, given the strong evidence of Cortez's guilt, this error could not be found outcome-determinative, as required for reversal. *Id.* "The properly admitted proof of defendant's morbid preoccupation with Ms. Woods combined with the forensic crime scene evidence linking him to her murder, was extraordinarily powerful as was were [sic] the cell phone records tracing defendant's movements toward and away from the locus of the crime." *Id.* And, he noted, Cortez could not rely on direct appeal, on challenges to the admitted evidence,

such as the fingerprint evidence. Such a claim, he stated, potentially could be raised in a 440 motion claiming ineffective assistance. *Id.*[5]

### 4.    Cortez's *Coram Nobis* Petition

On September 15, 2015, Cortez filed a *coram nobis* petition in the Appellate Division, arguing that his appellate counsel had been ineffective in failing to make arguments concerning the trial court's denial of his suppression motions. RA708–1053. On March 17, 2016, the Appellate Division denied this petition in a summary order. RA1054.

### 5.    Cortez's Second CPL 440 Motion

On March 21, 2016, Cortez moved in New York State Supreme Court, before Judge Patricia Nuñez, to vacate his conviction pursuant to CPL § 440.40. RA1056. Cortez argued that he was actually innocent, and that trial counsel had been ineffective by failing to introduce a surveillance video produced in pre-trial discovery by the prosecution. Cortez asserted that the video showed Haughn walking away from Woods's apartment building at 6:37 p.m., which, Cortez argued, was after the murder had taken place. RA1065. Cortez also faulted his trial counsel for failing to call a forensic expert to counter the prosecution expert's testimony about the fingerprint evidence, a cell phone expert, and certain lay witnesses; and for failing to secure DNA testing of the hairs found on Woods's hands after her death. RA1061–80.

On August 3, 2017, the trial court ("the 440 Court") issued a decision denying Cortez relief. Judge Cott's Report succinctly summarized this decision:

> The [440 Court] denied Cortez's motion. The 440 Court observed that Cortez had sought DNA testing in his previous § 440 motion, which had been denied, because the "hair evidence in this case was not dispositive." *Id.* at 1259. It further noted that his "new motion add[ed] nothing to the arguments which would

---

[5] Judge Abdus-Salaam wrote separately, differing with Chief Judge Lippmann on two points. She declined to endorse use of the federal standard governing conflict-waiver inquiries. RA659–60. And she argued that the evidence from Cortez's journal, although inadmissible on other grounds, did not implicate the *Molinuex* doctrine governing propensity evidence. *Id.* at 661–64.

merit revisiting the issue, much less coming to a different conclusion." *Id.* The 440 Court also ruled that Cortez had not presented "clear and convincing evidence of his innocence, nor ha[d] he presented any evidence of merit to warrant a hearing." *Id.* at 1268. Instead, his arguments went only to "the sufficiency of the evidence" and his theory "promoting Haughn as the perpetrator of this murder [was] fully examined at trial, and rejected by the jury." *Id.* at 1267–68.

Additionally, the 440 Court rejected Cortez's contention that new evidence cast doubt upon the fingerprint evidence. *Id.* at 1268–73. It concluded that Cortez's argument in his second 440 motion, in which he disputed for the first time that the fingerprint was his, "contradict[ed] his testimony and the defense theory at trial" where he had not disputed that the fingerprint was his. *Id.* at 1271. The 440 Court ruled that Cortez's newly-proffered evidence was not of such a character that it would "probably change the result if a new trial [were] granted," *id.* at 1268, 1273, explaining that the fingerprint evidence, combined with the "extensive" circumstantial evidence, "provided overwhelming proof of [Cortez's] guilt." *Id.* at 1271 (internal quotation marks omitted).

Finally, the 440 Court rejected Cortez's claims of ineffective assistance of counsel. It observed that its job was not to "second-guess counsel, or to assess counsels' performance with the clarity of hindsight, effectively substituting its own judgment of the best approach to the case." *Id.* at 1279. Indeed, "[t]he test is reasonable competence, not perfect representation." *Id.* Moreover, the court observed that petitioner bore the burden of "demonstrat[ing] the absence of strategic or their legitimate explanations for counsels' alleged deficiency." *Id.*

Report at 14–16.

Cortez then filed a motion to reargue. On December 7, 2017, the 440 Court denied that motion. *See* "Reargument Dec."[6] Cortez sought leave to appeal the 440 Court's decision to the Appellate division, which denied leave on January 11, 2018. RA1284.

## C.    Procedural History Before This Court

On January 26, 2018, Cortez filed a *pro se* § 2254 petition in this Court. Dkt. 2. In April 2018, the Court referred the case to Magistrate Judge Debra C. Freeman for general pretrial supervision. After a request from Cortez for appointment of counsel, Toni Marie Angeli, Esq.,

---

[6] The Court has reviewed this document in hard copy, drawn from the state-court docket. It does not appear in Respondent's Appendix or in the docket of this § 2254 action.

who had represented Cortez on his state court 440 motions, was appointed to represent Cortez in this action. Dkts. 4, 14.

On September 10, 2018, Cortez, counseled, filed a supplemental memorandum of law in support of his petition. Dkts. 18–21 ("Am. Pet."). It claimed (1) actual innocence, (2) ineffective assistance of counsel, in violation of the Sixth Amendment, and (3) prosecutorial misconduct, which Cortez cast as violating his due process rights. On December 24, 2018, respondent ("the State") filed a brief in opposition. Dkt. 30. On April 11, 2019, Cortez filed a reply. Dkts. 37–39. In his reply, Cortez requested an evidentiary hearing, and, with it, filed a motion for discovery. Dkts. 36–37. On April 12, 2019, Judge Freeman denied these motions as premature, stating that if, on review, she found a basis for discovery, she would address the issue *sua sponte*. Dkt. 47. She noted the "very limited circumstances" in which a hearing would be appropriate on federal habeas review of a state court conviction. *Id.*

On April 22, 2022, this case was reassigned to Judge Cott. Dkt. 49. On May 5, 2023, Judge Cott issued the presently pending Report, which, upon thorough analysis, recommended denying the petition. Dkt. 57 ("Report"). In the discussion that follows, the Court will review the Report's reasoning to the extent germane to the parties' objections. In overview, the Report found that although Cortez's claims generally were not procedurally barred on federal habeas review, the state court decisions that Cortez challenged did not unreasonably apply federal law, and thus he was not entitled to habeas relief under the governing deferential standard of review.

On August 11, 2023, both parties filed objections to the Report. Dkts. 64 ("Resp. Obj."), 65 ("Cortez Obj."). On August 25, 2023, each party filed a response to the other's objections. Dkts. 67 ("Cortez Reply."), 68 ("Resp. Reply"). On August 27, 2023, Cortez requested leave to

file a sur-reply, which the Court granted. Dkt. 70 ("Cortez Sur-Reply"). On September 1, 2023,

the State filed a sur-reply as well. Dkt. 73 ("Resp. Sur-Reply").

## II.    Applicable Legal Standards

### A.    Review of a Report and Recommendation

The Court "may accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). The Court shall

make a *de novo* determination of those portions of the report to which a party objects.

*Id.* § 636(b)(1). Where no objection is made, the Court reviews the Report for clear error. *See*

*McDonagh v. Astrue*, 672 F. Supp. 2d 542, 547 (S.D.N.Y. 2009).

### B.    AEDPA Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), for a writ

of habeas corpus under 28 U.S.C. § 2254 to be granted on a claim that was adjudicated on the

merits in state court, that claim must have "(1) resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," or "(2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d). "A claim is 'adjudicated on the merits' if the state court

ruled on the substance of the claim rather than on a procedural ground." *Jordan v. Lamanna*, 33

F.4th 144, 150 (2d Cir. 2022) (citing *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001)), *cert*

*dismissed*, 143 S. Ct. 992 (2023).

"A decision is 'contrary to' clearly established federal law 'if the state court arrives at a

conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state

court decided a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts." *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). And "[a]

decision is an 'unreasonable application' of clearly established federal law 'if the state court

identifies the correct governing legal principle from [the Supreme] Court's decision but

unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*,

529 U.S. at 413). The writ should be granted on grounds of unreasonableness only if "the state

court's ruling on the claim was so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at

151 (alteration omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "In other

words, the existence of reasonable arguments on both sides is all the government needs to prevail

in an AEDPA case." *Id.* (internal quotation marks and alterations omitted).

### C.    Exhaustion

Section 2254 "generally requires a petitioner for writ of habeas corpus to show that he

has 'exhausted the remedies available in the courts of the State' in order for the writ to be

granted." *McCray v. New York*, 573 F. App'x 22, 23 (2d Cir. 2014) (quoting 28

U.S.C. § 2254(b)(1)(A)); *see also Landy v. Costello*, 141 F.3d 1151, 1998 WL 105768, at *1 (2d

Cir. Mar. 9, 1988) ("[F]ailure to exhaust [state law remedies] would, of course, bar habeas

relief."). "Exhaustion of state remedies requires that a petitioner fairly present federal claims to

the state courts in order to give the state the opportunity to pass upon and correct alleged

violations of its prisoners' federal rights." *McCray*, 573 F. App'x at 23 (quoting *Carvajal v.*

*Artus*, 633 F.3d 95, 104 (2d Cir. 2011)). To fulfill the exhaustion requirement, a petitioner must

have presented the substance of his federal claims "to the highest court of the pertinent state."

*Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (quoting *Pesina v. Johnson*, 913 F.2d 53, 54

(2d Cir. 1990)).

In New York, a petitioner may exhaust his claims by filing a direct appeal to the relevant

Appellate Division and seeking leave to appeal to the New York Court of Appeals. *Olsen v.*

*Doldo*, No. 16 Civ. 5366 (RA) (DF), 2020 WL 685707, at *16 (S.D.N.Y. Jan. 2, 2020), *report and recommendation adopted*, 2020 WL 635605 (S.D.N.Y. Feb. 11, 2020). "New York procedural rules bar its state courts from hearing either claims that could have been raised on direct appeal but were not, or claims that were initially presented on appeal but were not presented to the Court of Appeals." *Sparks v. Burge*, No. 06 Civ. 6965 (KMK) (PED), 2012 WL 4479250, at *4 (S.D.N.Y. Sept. 28, 2012); *see also* CPL §§ 440.10(2)(a)–(c).

"Where a claim is not appropriate for direct appeal because it cannot be demonstrated on the basis of the pretrial or trial record . . . a petitioner may exhaust the claim by raising it to the state trial court in a collateral post-conviction motion, such as a motion pursuant to New York Criminal Procedure Law § 440." *Elleby v. Smith*, No. 20 Civ. 2935 (PAE), 2020 WL 2611921, at *3 (S.D.N.Y. May 22, 2020), *adhered to on denial of reconsideration*, 2020 WL 4058957 (S.D.N.Y. July 20, 2020). "If that motion is denied, [the petitioner] must then seek leave to appeal to the Appellate Division in order to exhaust his state court remedies." *Moreno-Gratini v. Sticht*, No. 19 Civ. 5964 (GHW) (SN), 2022 WL 1425712, at *7 (S.D.N.Y. Apr. 18, 2022), *report and recommendation adopted*, 2022 WL 1423298 (S.D.N.Y. May 5, 2022); *see* CPL § 450.90; *see also Cosey v. Lilley*, 460 F. Supp. 3d 346, 370 (S.D.N.Y. 2020) (noting that no further appellate review is available after Appellate Division denies leave to appeal denial of § 440.10 motion).

Although a court cannot grant an unexhausted claim, it may, under § 2254(b)(2), deny the petition on the merits. *Abuzaid v. Mattox*, 726 F.3d 311, 321 (2d Cir. 2013).

### D.    Adequate and Independent State Grounds

Even if technically exhausted, "[a] federal habeas court will not review a claim rejected by a state court 'if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Beard v. Kindler*, 558 U.S. 53,

55 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). "This rule applies

whether the state law ground is substantive of procedural." *Coleman*, 501 U.S. at 729.

"However, the state law ground is only adequate to support the judgment and foreclose review of

a federal claim if it is 'firmly established and regularly followed' in the state." *Garvey v.*

*Duncan*, 485 F.3d 7009, 713 (2d Cir. 2007) (quoting *Lee v. Kemma*, 534 U.S. 362, 376 (2002)).

"Since the adequacy of a state procedural bar to the assertion of a federal question is itself

a federal question, [the court] must ascertain whether the state rule at issue . . . is firmly

established and regularly followed, and further whether application of that rule in this case would

be exorbitant." *Id.* at 714 (internal citations omitted). "To do so, [the court] looks at the statute

and case law construing it." *Id.*

The adequate and independent state grounds doctrine does not, however, bar relief where

"the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged

violation of federal law, or demonstrate that failure to consider the claims will result in a

fundamental miscarriage of justice." *Smith v. Lee*, No. 11 Civ. 8376 (PAE), 2013 WL 2467988,

at *11 (S.D.N.Y. June 7, 2013) (quoting *Coleman*, 501 U.S. at 750). A court may excuse a

procedural default only "if the petitioner demonstrates either cause for the default and actual

prejudice from the alleged violation of federal law, or that the failure to consider the claims will

'result in a fundamental miscarriage of justice.'" *Acosta v. Giambruno*, 326 F. Supp. 2d 513,

520 (S.D.N.Y. 2004) (quoting *Coleman*, 501 U.S. at 750). In this context, "cause" means "'some

objective factor external to the defense [that] impeded counsel's efforts' to raise the claim in

state court." *Id.* (quoting *McCleskey v. Zant*, 499 U.S. 467, 493 (1991)). "[A]ctual prejudice"

requires the petitioner to show "actual and substantial disadvantage, infecting his entire trial with

error of constitutional dimensions." *Id.* (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

"A miscarriage of justice occurs 'in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent[.]'" *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). "To establish actual innocence, petitioner must demonstrate that 'in light of all the evidence,' 'it is more likely than not that no reasonable juror would have convicted him.'" *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) (quoting *Bousley v. United States*, 523 U.S. 614, 623–24 (1998)). Thus, a credible and compelling claim of actual innocence can serve as a "gateway" that allows "federal courts to hear [otherwise] barred claims" under AEDPA. *Rivas*, 687 F.3d at 551.

## III.    Discussion

### A.    Cortez's Claim of Actual Innocence

Cortez's objections largely argue his actual innocence. As the Report recognizes, the Supreme Court has not recognized a "freestanding" actual innocence claim as a basis for § 2254 relief. Report at 21 (citing *Bryant v. Thomas*, 725 F. App'x 72, 73 (2d Cir. 2018); *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013)). A "credible" and "compelling" claim of actual innocence, however, can serve as a "gateway" permitting an otherwise procedurally barred claim of a constitutional error to be heard. *See Rivas*, 687 F.3d at 540, 551. The Report found Cortez's gateway claim of actual innocence likely waived, because Cortez first raised it in his reply brief, but nonetheless considered it for the sake of "completeness." Report at 24–25 & n.7. It found that the petition did not make out a compelling such claim, but merely a credible one, and that Cortez's gateway claim thus failed on the merits. *Id.* at 25–32.

Cortez objects on various grounds to that conclusion. The Court here adopts the Report's determination that Cortez likely waived the actual innocence gateway claim. But like the Report,

the Court considers Cortez's objections in the interest of completeness—and also finds Cortez

not to have made a compelling such showing. At the threshold, however, the Court notes that the

resolution of this dispute has limited consequence. It would eliminate the procedural bar the

Court finds below to one of Cortez's claims: of prosecutorial misconduct in summation. But that

claim, as reviewed below, fails independently on the merits.

To establish an actual innocence gateway claim based on new evidence, that evidence,

considered "in light of all the evidence," must make it "more likely than not that no reasonable

juror would have found [the] petitioner guilty beyond a reasonable doubt." *Doe v. Menefee*, 391

F.3d 147, 163 (2d Cir. 2004) (quoting *Schlup v Delo*, 513 U.S 298, 327 (1995). Such a

"gateway" claim for actual innocence must be both "credible" and "compelling":

> For the claim to be "credible," it must be supported by "new reliable evidence—
> whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or
> critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at
> 324; *House [v. Bell]*, 547 U.S. [518,] 537 [(2006)]. For the claim to be
> "compelling," the petitioner must demonstrate that "more likely than not, in light
> of the new evidence, no reasonable juror would find him guilty beyond a reasonable
> doubt—or to remove the double negative, that more likely than not any reasonable
> juror would have a reasonable doubt." *House*, 547 U.S. at 538.

*Rivas*, 687 F.3d at 541 (2d Cir. 2012). A court thus must make "a probabilistic determination

about what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329. As

elaborated in the caselaw, "the *Schlup* standard is demanding and permits review only in the

'extraordinary' case." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327).

The Report concluded that Cortez's proposed new evidence—consisting of "expert

affidavits relating to the fingerprint evidence" and "surveillance footage allegedly showing

Haughn leaving Woods's apartment building around the time of her murder"—was new and

reliable, making his actual innocence claim credible. Report at 26–29. As to the fingerprint

evidence, the Report noted that Cortez had provided, in his petition to the 440 Court, affidavits

from several experts specializing in blood splatter or fingerprint analysis opining that it was at

least inconclusive that Cortez's fingerprint on Woods's apartment wall had been made in blood.

*Id.* at 27–28. As to the surveillance video, which the prosecution produced in pretrial discovery,

the Report noted that a file name associated with the video bears an indication that, if taken as

accurate, would appear to support that Haughn left Woods's apartment at 6:37:52 p.m. the night

of the murder. As the Report recognized, however, the video lacks a time stamp, and Cortez had

not come forward with evidence supporting the accuracy of the time listed on the file name.[7]

The Report found this evidence—the expert reports and the video—to be "credible" evidence of

innocence. As no party objects to that conclusion, the Court reviews it for clear error. Finding

none, the Court adopts this aspect of the Report.

Cortez, however, objects to the Report's conclusion that these items, even considered

together, were not "compelling" evidence of his actual innocence, such that it was more likely

than not that no reasonable juror would find Cortez guilty. *See* Report at 30–32; Cortez Obj. at

2–11. He contends that the Report erred in several respects.

First, Cortez objects to the Report's citation to *Cosey v. Lilley*, 62 F.4th 74 (2d Cir. 2023),

in support of its finding that the new fingerprint evidence was insufficient to make his actual

innocence case compelling. Cortez Obj. at 4–6. In *Cosey,* the Second Circuit noted forensic

evidence as to a bullet's trajectory that strongly undermined the prosecution's narrative, but held

that, because the experts propounding that evidence acknowledged that the prosecution's theory

---

[7] Cortez notes trial testimony from the manager of the building that maintained the security camera to the effect that he believed a timestamp on a video still was accurate because he understood the time to be synchronized via the internet. *See* Trial Tr. 428. But that testimony does not speak to the accuracy of the time indication on the file stamp. The State proffers that the file names correspond to the times at which these videos were saved to the surveillance system, which does not necessarily match the time at which the videos were recorded. Resp. Reply at 5–6.

was still "technically possible," the evidence did not "establish[] a credible and compelling claim of actual innocence[.]" *Cosey*, 62 F.4th at 85. Cortez argues that the Circuit's characterization of that evidence as "troubling" but "ultimately inconclusive"—and thus short of "compelling"—is inapposite here, where he contends his new forensic evidence of innocence is stronger. *See* Cortez Obj. at 4–6 (citing *Cosey*, 62 F.4th at 84–85).

The Report did not err in its citation to *Cosey*. The Report cited *Cosey* for the proposition that forensic evidence that is inconclusive as to a petitioner's innocence does not clear the high bar for "compelling" evidence of innocence set in *Schlup*. Report at 30. The Report concluded that the new fingerprint evidence at issue here—which "[a]t best" a jury would find called into doubt a key piece of physical evidence against Cortez—was itself inconclusive as to Cortez's innocence. The new evidence thus, the Report reasoned, could not materially support Cortez's actual innocence claim. *Id.* That conclusion was rightly anchored in the facts of this case: that evidence of Cortez's bloody fingerprint, although strong evidence of guilt, was not the only the evidence of guilt or the definitive lynchpin of the prosecution's case. *See* Report at 30. Even assuming Cortez's expert affidavits were assumed to fully neutralize the fingerprint evidence, a reasonable juror, viewing the remaining evidence including the bloody boot-print matching Cortez's footwear that night and formidable circumstantial evidence, could still easily find Cortez guilty beyond a reasonable doubt. *See, e.g.*, *Tuitt v. Martuscello*, No. 12 Civ. 1003 (CS) (PED), 2013 WL 5508385, at *16 (S.D.N.Y. Oct. 3, 2013) (even if missing rape kit showed petitioner's DNA was not recovered from victim, such would not make out a compelling case of actual innocence as medical evidence not required to convict); *Hyman v. Brown*, 927 F.3d 639, 664–65 (2d Cir. 2019) (new evidence establishing alleged eye witness did not actually see shootout not enough to find compelling claim of actual innocence, as such could only neutralize

inculpatory evidence, not establish factual innocence); *Bousley v. United* States, 523 U.S. 614,

623 (1998) (actual innocence claim goes to "factual innocence" not legal sufficiency).  The

Report's citation to *Cosey* as instructive authority was entirely proper.

Indeed, *Cosey*—in its citation to another Second Circuit case, *Rivas v. Fischer*, 687 F.3d

514 (2d Cir. 2012), that found "compelling evidence"—underscores the critical distinction drawn

by the Report.  In *Rivas*, as *Cosey* emphasized, the Second Circuit held:

> that a petitioner met the requirements for the actual innocence gateway exception
> by presenting the "essentially unchallenged" testimony of a renowned forensic
> pathologist who determined to a "reasonable degree of medical certainty" that the
> victim was killed at a time when the petitioner had an undisputed alibi. *Rivas*, 687
> F.3d at 543–47.  During post-conviction proceedings, the State in Rivas did not call
> its own expert or raise any challenges to the petitioner's expert's qualifications or
> conclusions.  *Id.*  [The Second Circuit] determined that even this was a "close case"
> and that "we would not expect a lesser showing of actual innocence to satisfy the
> *Schlup* standard." *Id.* at 546.

*Cosey*, 62 F.4th at 85 n.10.  In other words, the new forensic evidence in *Rivas* pointed almost

ineluctably to the petitioner's innocence, and, in the Second Circuit's view, a lesser showing

would not qualify as "compelling." *See Rivas*, 687 F.3d at 546.  The new fingerprint evidence in

this case is materially less probative than the new evidence in *Rivas*, because, while undermining

one pillar of the prosecution's case, it does not affirmatively support the movant's innocence.

The Court thus adopts the Report's reasoning on this point.

Second, Cortez objects to the Report's finding that the new video evidence was not

enough to establish a compelling case of actual innocence.  Cortez argues that the prosecution

proved at trial that Woods's murder occurred sometime between 6:20 p.m. and 6:35 p.m. on

November 27, 2005; and that a video showing Haughn leaving the apartment at 6:37 p.m. would

definitively show that Haughn was in the apartment when Woods was murdered.  Cortez Obj. at

6–7.  Cortez challenges the Report's statement that—assuming that the time reflected on the file

stamp associated with this video were proven accurate—it was insufficient to refute the

Prosecution's timeline." *See* Cortez Obj. at 6 (citing Report at 31).

At the outset, Cortez's objection to the Report's statement to this effect does not avail

him, given his failure to adduce evidence establishing the vital premise underlying the objection:

that the file stamp on the video was accurate. But, even accepting the premise that the video

accurately reports Haughn leaving at 6:37 p.m., that evidence would fall short of compelling

proof of innocence, considering the evidence as a whole. *See Doe*, 391 F.3d at 162 (on claim of

actual innocence, "*Schlup* unequivocably requires that reviewing courts consider a petitioner's

claim in light of the evidence in the record as a whole, including evidence that might have been

inadmissible at trial[.]"). Cortez's contention that the prosecution proved "beyond a shadow of a

doubt" that Woods was murdered between 6:20 p.m. and 6:35 p.m., Cortez Obj. at 6, overstates

the record. The Report instead correctly characterized the 6:20 to 6:35 timeframe as the

prosecution's (strong) *hypothesis*.

At trial, the prosecution's theory was that, sometime after 6:00 p.m. the evening of the

murder, Haughn left Woods's apartment to pick up his car, and was gone for about 20 minutes.

*See* Trial Tr. 2046. During that time, the prosecution argued, Cortez, whose cell phone location

data put him in the vicinity of Woods's apartment from about 5:30 p.m. until at least 6:33 p.m.,

PA 21–22, waited outside the apartment, saw Haughn leave, snuck in and committed the murder.

Trial Tr. 45–46. The prosecution acknowledged that the precise timeline was uncertain. See,

e.g., *id.* at 37 (in opening statement, describing Haughn's departure as occurring "sometime after

six, we don't know exactly the time"). But it offered evidence consistent with that timeline.

Most centrally, this included testimony from Andrew Gold, a resident of the apartment building,

that he heard screaming several minutes into a call with his fiancé, which phone records confirm

commenced at 6:18 p.m., *id.* at 208–09, 626, and from the doorman and superintendent at the

building on 87th Street where Haughn stopped on his way to get to the car, who recalled

speaking to Haughn for 10 minutes or so at around 6:15 or 6:30 p.m., *see id.* at 2044. Cortez's

cell site location places him approximately 10 blocks away from Woods's apartment at 6:50 p.m.

that night, PA 21–22, and the parties stipulated that the 911 call Haughn himself made came in at

6:59 p.m., Trial Tr. 1335.

      In light of these coordinates, it is not accurate to state that the prosecution definitively

proved that the murder occurred between 6:20 p.m. and 6:35 p.m., such that a video showing

Haughn walking away from the apartment at 6:37 p.m. definitively places him in the apartment

at the time of the murder. To be sure, conclusive evidence that Haughn was walking away from

Woods's apartment at 6:37 p.m. would have left a shorter window thereafter in which Cortez

could have entered the apartment, committed the murder, and gotten about 10 blocks away to

95th and First Avenue by 6:50 p.m. *Cf.* PA 21–22. And the prosecution would have to square

Gold's testimony, and the testimony of Haughn's coworkers, with an adjusted timeline. Gold's

testimony, in particular, that he heard screams while on the phone with his fiancé, would present

a challenge for the prosecution, as phone records corroborate that that call lasted from 6:18 p.m.

to about 6:40 p.m. Trial Tr. 626. In other words, the video, if its file time stamp were shown to

accurately capture the time of the events depicted, would have materially assisted the defense, by

making it more difficult to reconcile the prosecution's theory at trial of the murder's timeline

with its claim that Cortez was the killer. But that the timeline is more challenging to reconcile

with guilt is not enough to meet the *Schlup* standard. *See, e.g., Cosey*, 62 F.4th at 85 (where new

evidence made prosecution's theory "troubling" but remained still technically "possible" did not

make compelling claim of actual innocence); *Williams v. Bradt*, No. 10 Civ. 3910 (DLI), 2016

WL 1273228, at *12 (E.D.N.Y. Mar. 30, 2016) (phone records inconclusive as to ultimate time of death insufficient to give petitioner alibi and constitute compelling evidence of actual innocence). And the narrowed timeline would still permit a reasonable jury to convict, including based on the other variegated evidence of guilt, such as—even putting aside Cortez's bloody fingerprint—the bloody boot print that matched Cortez, Cortez's presence at the vicinity of the murder at the time it occurred, Cortez's obsessive calls to and writings about Woods, and his suspicious post-murder statements and behavior. Moreover, Cortez's alternative theory that Haughn was the killer, which he bases on the new video evidence, is itself problematic. A jury would have to credit the narrative that Haughn, after violently murdering Woods without an obvious motive to do so, left shortly thereafter to get his car, smuggled the never-recovered murder weapon out of the apartment, on route talked apparently normally with two co-workers for 10 or 15 minutes leaving no outward signs of strain, trauma, or blood, *see* Trial Tr. 488–89, left his car idling around the corner, and then reentered Woods's apartment and made the 911 call in which he reported a bloody boot print that later happened to match in style and size the boot Cortez wore that night.

The Report's assessment of the legal significance of the video, if time-validated, was thus nuanced and correct.

Contrary to Cortez's related objection, the Report was also right to find that *House v. Bell*, 547 U.S. 518 (2006), is not a fair analogue for Cortez on this point. Cortez argues that the Report misread *House*, which found the *Schlup* standard met, to have involved "DNA testing that contradicted the prosecution's main theory of motivation and which directly pointed to the other suspect in that case." Cortez Obj. at 9 (quoting Report at 31–32). Cortez argues that *House*

actually involved DNA evidence that "did not point directly to the other suspect in such a way as to inculpate that suspect. Instead, it merely pointed away from the [petitioner]." *Id.*

Cortez misreads *House*. *House* considered two categories of new DNA evidence: one relating to semen found in a murder victim's underwear, and one relating to blood found on the petitioner's pants. *House*, 547 U.S. at 540–48. As to the former, new evidence confirmed this DNA was from the victim's husband. This, the Supreme Court found, undermined a key theory of the prosecution with respect to motive: that the petitioner (not the victim's husband) had sexually assaulted the victim before killing her. *Id.* at 540–42. As to the latter, new evidence produced a plausible (and innocent) scientific explanation why the victim's blood was found on the petitioner's clothing. That evidence, if established conclusively, had potential to neutralize a strong piece of evidence of the petitioner's guilt. *See id.* at 542–48. But notwithstanding this powerful new evidence, the *House* Court found that, despite the questions House had raised "about the blood and semen evidence," without more, "the other evidence favoring the prosecution," "might well suffice to bar relief." *House*, 547 U.S. at 548. It was only because of additional "troubling evidence" that the victim's husband "himself could have been the murderer" that the *Schlup* standard was met. *Id.* at 551. This evidence included "two different witnesses . . . describ[ing] a confession by Mr. Muncey" and "two more . . . describ[ing] suspicious behavior [on the husband's part] around the time of the crime." *Id.* at 551.

Cortez's case does not rise to that level. The expert affidavits create uncertainty about whether his fingerprint was in blood, but they are not directly exculpatory; and the surveillance footage, although problematic for the prosecution's timeline, does not implicate Haughn in the murder, let alone as potently as did the evidence implicating the husband in *House*.

Cortez next objects to the Report's comment that Cortez's new evidence is less compelling because, even without it, Cortez was able to press his theories that the fingerprint predated the murder and that the prosecution's timeline was suspect. *See* Cortez Obj. at 8–9 (citing Report at 31). Cortez is right that the defense case would have been fortified by the new evidence, if credited (and as to the video evidence, if authenticated as to time). But the Report was also correct in observing that this new evidence buttressed theories advanced by the defense at trial, and on an actual innocence gateway claim, the Court must review "'all the evidence,' old and new." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327–28); *see also Dunbar v. Griffin*, No. 11 Civ. 5858 (CBA), 2022 WL 36366, at *1 (E.D.N.Y. Jan. 4, 2022) ("Courts have been wary of finding evidence of actual innocence where supposedly new evidence does little more than provide further evidence of an argument raised at trial.").

As to all the above objections, Cortez's challenge to the Report's declination to find his new evidence "compelling" are weakened by his too-ready disregard of the diverse incriminating evidence received at trial, canvassed above. That evidence supplied a strong basis for the verdict. Even maximally crediting Cortez's new evidence, the existing evidence would still provide a solid basis for that verdict. *See Hyman*, 927 F.3d at 665 (to be found compelling, new evidence, considered against old, must prove that petitioner "*did not* commit, or *could not* have committed, the crimes of conviction"); *Dunbar*, 2022 WL 36366, at *5 (where new evidence strengthened petitioner's case but did not offset prosecution's case, not compelling); *Fabers v. Lamanna*, No. 18 Civ. 2399 (PKC), 2020 WL 1875288, at *23 (E.D.N.Y. Apr. 15, 2020) ("New evidence that merely conflicts with the evidence presented at trial is insufficient to demonstrate that 'no reasonable juror,' presented with this new evidence 'would find [the petitioner] guilty beyond a reasonable doubt.' (quoting *Rivas*, 687 F.3d at 541)). The Report did not err in

assessing that the new evidence did not make it more likely than not that no reasonable jury could convict.

The Court, finally, addresses two issues adjacent to Cortez's actual innocence claim.

*Prosecution's new evidence*: On April 9, 2024, the Court received a letter from the State detailing additional evidence *it* had obtained, from a reinvestigation conducted by the Manhattan District Attorney's Office in conjunction with the Perlmutter Center for Legal Justice. Dkt. 73. This letter stated that an independent expert had made an identification based on latent fingerprints lifted from a broken guitar found at the crime scene, which had not been undertaken as of trial. *See id.* The fingerprints were found to belong to Cortez, not Haughn. *See id.*, Ex. 1. In letter-briefing this Court commissioned after receiving this letter, the parties agreed that this evidence can properly be considered only on a claim of actual innocence. *See* Dkts. 75, 76. There is no argument that this evidence is exculpatory. And, without more, there is no basis to treat it as inculpatory. The analysis above accordingly is undisturbed by this development.[8]

*Cortez's request for a hearing*: In his Objections, Cortez requests a hearing. *See, e.g.*, Cortez Obj. at 10–11. "If a claim has been adjudicated on the merits by a state court," a federal habeas court is precluded from holding an evidentiary hearing on that claim, as it must review the state court's decision based on the same record the state court had before it. *Pinholster*, 563 U.S. at 185. Here, the Report found that all relevant claims had been decided on the merits by a state court. Cortez does not dispute that finding. The Court—even had it been so inclined—thus could not hold an evidentiary hearing on any claims Cortez brings pursuant to § 2254(d). *See id.*

---

[8] The Court has considered Cortez's claim that the reinvestigation revealed a *Brady* violation regarding Woods's diary. *See* Dkt. 76. Cortez, however, does not explain how this diary would advance his claim of actual innocence, which appears to be the only vehicle by which the Court could consider it as new evidence.

The Court does, however, have "broad discretion" to hold an evidentiary hearing on a gateway actual innocence claim, provided the petitioner puts forward new evidence satisfying the criteria set by § 2254(e)(2). *See Drake v. Portuondo*, 321 F.3d 338, 347 (2d Cir. 2003); *Lopez v. Miller*, 906 F. Supp. 2d 42, 53–54 (E.D.N.Y. 2012). Cortez has not done so here. Regardless, the Court agrees with the Report that a hearing is unnecessary to elucidate Cortez's actual innocence claim. The Court (like the Report) has read the new evidence in the light most favorable to Cortez, *see* Report at 32 n.11, and still has not found Cortez to establish an actual innocence claim. A hearing could not advance his cause further.

Accordingly, the Court rejects Cortez's objections as to the Report's treatment of his actual innocence gateway claim, and adopts in full this section of the Report.

### B.    Ineffective Assistance of Counsel Claims

Cortez brings two categories of ineffective assistance of counsel claims: that (1) his trial counsel, Miranda and Florio, each had conflicts precluding them from representing him; and (2) he received substantively ineffective assistance at trial.[9]

The Sixth Amendment affords a defendant in criminal proceedings the right "to effective assistance from his attorney at all critical stages in the proceedings." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013). A defendant claiming ineffective assistance must establish

---

[9] Cortez objects that the Report failed to address another category of ineffective assistance claim, one based on *United States v. Cronic*, 466 U.S. 648 (1984). Cortez Obj. at 12 (citing Pet. at 39). *Cronic* recognized a distinct such claim that occurs when an attorney entirely fails to show up to a key part of a criminal proceeding, or completely fails to subject the prosecution's case to adversarial testing; unlike other ineffective assistance claims, claims of this nature do not require a showing of prejudice. *Cronic*, 466 U.S. at 659. Cortez's objection here, however, based on the claim that his counsel conducted a lackluster investigation, is not of that nature. It instead alleges substantive ineffective assistance; the Court thus addresses it in reviewing that claim. *See* Am. Pet. at 36–39 (claiming failure to investigate as basis for *Cronic* claim); *see also Bell*, 535 U.S. at 686–87 (holding errors such as failure to adduce mitigating evidence of a sort suitable to standard *Strickland* analysis).

that (1) his "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If both established, these showings demonstrate "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

As for *Strickland*'s first prong, a court "must judge [counsel's] conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 690). A court is to start from the "strong presumption" that counsel's conduct fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. That is because there are many ways to provide effective assistance, and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689–90; *see also id.* at 689 ("Judicial scrutiny of counsel's performance must be highly deferential."); *Rivas*, 780 F.3d at 547.

As for *Strickland*'s second prong, proving prejudice requires a defendant to show that but for counsel's errors, there was a reasonable probability that the outcome would have been different—a "probability sufficient to undermine confidence in the outcome." *Bierenbaum v. Graham*, 607 F.3d 36, 51 (2d Cir. 2010) (quoting *Strickland*, 466 U.S. at 694). In the context of a challenge to trial representation, a reviewing court must examine "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citation omitted).

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so[.]" *Harrington v.*

*Richter*, 562 U.S. 86, 105 (2011) (internal citations omitted). "The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.* (citing *Strickland*, 556 U.S. at 123). "Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

The Supreme Court has recognized at least two exceptions to the prejudice prong of the *Strickland* standard. First, "where assistance of counsel has been denied entirely or during a critical stage of the proceeding," the Court assumes prejudice as "the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002) (citing *Cronic*, 466 U.S. at 658–59). Second, "when the defendant's attorney actively represented conflicting interests," the defendant must show that the conflict "actually affected the adequacy of his representation," but "need not demonstrate prejudice [as under *Strickland*] in order to obtain relief." *Id.* at 166, 171–72 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980)). The Supreme Court, however, has held such an "actual" conflict of interest to exist, so as to excuse a defendant from needing to show prejudice under *Strickland*, only in the context of "multiple concurrent representation." *Id.* at 175.

### 1.    Conflict-Based Ineffective Assistance Claims

Cortez claims a denial of effective assistance on the ground that his trial counsel operated under conflicts of interest: Miranda for having been held in contempt for missing the first three days when trial had been scheduled to begin, and Florio for having been under indictment by the office prosecuting Cortez before and during Cortez's trial. The Report found that Cortez had exhausted both claims by raising them at every level on direct appeal, and before the 440 Court on collateral review, Report at 33–34, and construed the 440 Court as deciding (and denying)

41

Cortez's conflict claims on the merits, thus eliminating any procedural bar to federal review, *id.* at 34–35. On the merits, however, the Report found that only Florio operated under an actual conflict, Report at 39–40, and that the last state court to consider this claim on the merits, the Court of Appeals, did not err when it found that Cortez had not shown this conflict to "operate on the defense," *id.* at 40–41.

### a.    *Finding of no procedural bar*

Although not squarely challenging the Report's finding that Cortez's claim is not procedurally defaulted, the State objects to the finding that Cortez exhausted his ineffective assistance claim with respect to Miranda's conflict. The State argues that the Report erroneously concluded that Cortez raised this claim at the Court of Appeals, when he did not. Resp. Obj. at 3–4. On its review, this Court finds the State is correct on this point—Cortez did not raise the Miranda conflict-based claim to the Court of Appeals—but that lapse does not procedurally bar federal review.

The Report was mistaken in concluding that "Cortez did, in fact, pursue his claim against Miranda in his petition before the Court of Appeals." Report at 34. By all accounts, Cortez pursued his conflict claims as to both trial counsel through his direct appeal before the Appellate Division. But thereafter, once "being granted leave to present briefing to the Court of Appeals, he focused in on Florio's conflict[.]" Cortez Reply at 32; *see also* RA289–92 (table of contents for Cortez's Court of Appeals brief, exclusively addressing on Florio's conflict and Cortez's allegedly inadequate waiver with respect to it). Cortez contends that he still "spent many pages exposing Miranda's deficient performance, and edifying the conflict claim," Cortez Reply at 32, but in fact, the cited portions of Cortez's Court of Appeals brief refer at most tangentially to Miranda as potentially conflicted, a contrast it used to underscore the gravity of Florio's conflict. *See, e.g.*, RA338–39 (brief arguing that trial court's hearing as to Florio conflict was inadequate

in part because it did not discuss potential appointment of outside counsel given Cortez's misgivings about Florio *and* Miranda); RA311–12 (same brief, noting Miranda's contempt citation as context for substantive ineffectiveness claim based on counsels' unpreparedness for trial). The Report's own citation for the proposition that Cortez raised the issue of Miranda's conflict before the Court of Appeals is to Cortez's brief before the 440 Court. *See* Report at 34 (citing RA1124–25, which reprints Cortez's 440 briefing).

Cortez did, in his brief to the Court of Appeals, state in a footnote that "[t]hough not specifically briefing them in this Court, defendant renews and preserves all other arguments and issues raised in his Appellate Division submissions." RA307 n.1. But such a general reference, particularly when contrasted with the brief's elaboration on other claims, did not exhaust an issue for purposes of federal habeas review. *See, e.g.*, *Jordan v. Lefevre*, 206 F.3d 196, 199 (2d Cir. 2000) ("Counsel may not transfer to the state courts the duty to comb through an applicant's appellate brief to seek and find arguments not expressly pointed out in the application for leave."); *Strogov v. Attorney General of State of N.Y.*, 191 F.3d 188, 193 (2d Cir. 1999) (passing reference to federal constitutional claim in footnote in unrelated section of brief insufficient to exhaust for habeas purposes).

The State's observation that Cortez did not adequately raise Miranda's conflict before the Court of Appeals is, however, ultimately legally irrelevant. That is because, given the nature of the claim, Cortez was not obliged to raise it on direct appeal. "A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." *United States v. Blau*, 159 F.3d 68, 74 (2d Cir. 1998). Prejudice is presumed "if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at

692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)).  The "actual conflict" and "adversely affected" "components are considered in a single, integrated inquiry," *Eisemann v. Herbert*, 401 F.3d 102, 107 (2d Cir. 2005); an "'actual conflict' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance," *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002).  And in raising his claims of a conflict in state court (and in this Court), Cortez needed to rely on evidence outside the trial record going to any alleged adverse effect a supposed conflict worked on his counsel's performance.

For that reason, the Appellate Division—where Cortez pressed his claim of a conflict on Miranda's part—declined to resolve that claim, noting that it rested on "speculation and [was] unsupported by anything [*then*] in the record."  RA285 ("In any event, the existing record is insufficient to show that the conduct of the defense was affected by the operation of either or both of these alleged conflicts of interest.").  It held, correctly, that Cortez's ineffective assistance claims were "unreviewable on direct appeal, and thus procedurally defective, because they involve matters outside the record."  RA285; *cf.* RA675 (Chief Judge Lippman, in concurrence at Court of Appeals, noting, in discussing Cortez's claim based on Florio's conflict, "[e]ven if co-counsel [Florio]'s representation of defendant was in some important respects wanting, the record sheds no light on the fact-sensitive question of whether any such deficiencies were traceable to conflict generated reticence.").  Cortez's ineffective assistance claims, turning on evidence outside the trial record, thus were properly brought on collateral review.  *See, e.g.*, *People v. Hartle*, 142 N.Y.S.3d 660, 662 & n.2 (2021), *aff'd*, 40 N.Y.3d 39 (3d Dep't 2023) ("defendant's current ineffective assistance claim is based upon nonrecord facts—the proper subject of a CPL article 440 motion"); *Pierotti v. Walsh*, 834 F.3d 171, 178  (2d Cir. 2016) ("New York case law indicates that [petitioner] did not have to raise his ineffective assistance of

counsel claim [based on extra record evidence] on direct appeal."). And it is undisputed that Cortez pressed those claims on collateral review: before the 440 Court and again on a motion for reargument. *See, e.g., Flores v. Officer in Charge, Buffalo Fed. Det. Facility*, No. 11 Civ. 7977 (RA), 2014 WL 1568843, at *1 (S.D.N.Y. Apr. 17, 2014) ("In New York, '[t]o properly exhaust an ineffective assistance of counsel claim that relies on evidence outside the pretrial and trial record, petitioner must raise it as part of a motion to vacate judgment under CPL § 440.10 and then seek leave to appeal to the Appellate Division.'" (quoting *Anthoulis v. New York*, No. 11 Civ. 1908 (BMC), 2012 WL 194978, at *3 (E.D.N.Y. Jan. 23, 2012)).

The Court thus adopts the Report's conclusion that Cortez preserved and properly exhausted his conflict claims, albeit based on modified reasoning.[10]

   *b.*  *Merits*

On the merits, the Report, applying AEDPA's standard of review, concluded that the relevant state court decisions reasonably rejected Cortez's conflict-based ineffective assistance claims with respect to both counsel. Report at 38–41. Cortez's objections to this conclusion are unavailing.

---

[10] The 440 Court, in its decision on reargument, does appear to have rejected Cortez's conflict-based ineffective assistance claims on the basis of New York C.P.L. § 440(2), which effects a procedural bar to collateral review of claims actually raised or that could have been raised on direct review. Reargument Dec. at 3–4. But various courts have held that when a 440 Court declines to consider on the basis of some of C.P.L. § 440.10(2)'s subsections, it does not effect a procedural bar to federal habeas review. *See, e.g., Bethea v. Walsh*, No. 09 Civ. 5037 (NGG), 2016 WL 258639, at *12–15 (E.D.N.Y. Jan. 19, 2016) (canvassing case law on this point). In the interest of completeness, the Court assumes *arguendo* that this aspect of the 440 Court's ruling does not procedurally bar the instant § 2254 claim. *See, e.g., Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005) (per curiam) (declining to address procedural default argument and considering the merits); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel" deferring a ruling on the procedural default question especially where it "involve[s] complicated issues of state law."); *see also Trest v. Cain*, 522 U.S. 87, 89 (1997) (procedural default in habeas context is not jurisdictional).

At the outset, Cortez does not appear to object to the Report's resolution of the claim based on Miranda's potential conflict. *See* Cortez Obj. at 12–15. The Court thus reviews that portion of the Report for clear error. The Court finds none. The Report is correct that federal law has not established that a contempt citation works an "actual" conflict so as to waive *Strickland*'s applicability, Report at 40 (citing *Mickens*, 535 U.S. at 175). The Court adopts the Report's recommendation as to this claim.

As to Florio, Cortez's main objection is that it was error for the Court of Appeals and the Report in reviewing its reasoning to apply the *Strickland* standard. Cortez contends that Florio's actual conflict based on the charges pending against her removed her conflict from the *Strickland* framework. Cortez Obj. at 13–15. But, as the Report noted, under Supreme Court (and Second Circuit) precedent, the unrelated charges against Florio do not give rise to the type of "actual conflict" that eliminates *Strickland*'s requirement to show prejudice. In any event, Cortez's objection fails because it mischaracterizes the reasoning of both the Court of Appeals and the Report.

The Court of Appeals, in considering the conflict claim against Florio, found that under New York precedent,[11] the unwaived conflict would be, at most, a "potential" conflict, requiring a showing that the conflict "operated on the defense." RA 674–75. Finding that, on the record before it, Cortez had not produced any evidence tending to show that the deficiencies he claimed in Florio's performance derived from the fact of the charge pending against her, the Court of Appeals rejected the conflict-based assistance claim. *Id.* The Report adopted the Court of Appeals's reasoning. It noted Cortez's failure to adduce any evidence, even in a bolstered post-

---

[11] There is no suggestion that the New York standard is "contrary to" established federal law. The absence of a citation by the Court of Appeals to cite federal law does not alter review under AEDPA. *See Eze v. Senkowski*, 321 F.3d 110, 122–23 (2d Cir. 2003).

conviction record, that any action or omission by Florio "was a direct result of the pending criminal charge against her." Report at 41.

Significantly, the inquiry whether a conflict "operated on the defense" does not implicate the prejudice inquiry under *Strickland*. *See Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980) ("Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief."). Thus, although the Report rightly held (based on Sixth Amendment caselaw) that the *Strickland* standard would apply to Cortez's conflict-based claim relating to Florio, that holding is beside the point. The Court of Appeals's rejection of Cortez's claim ultimately did not turn on the prejudice prong. *See* RA674–75 (Cortez needed to "show that the conflict operated on the defense"). Nor did the Report's deference to that analysis. *See* Report at 41 ("Accordingly, because Cortez has not established that any failings by Florio were a direct result of her indictment, the claim fails."). Cortez's objections claiming misapplication of the *Strickland* standard are thus ill-founded.

Cortez also objects on the ground that he has purportedly shown that Florio's conflict operated on his defense. That objection is easily put aside. Cortez declares that Florio took or refrained from certain actions in defending Cortez based on the charge pending against her. Cortez Obj. at 15. But that is an *ipse dixit*; Cortez has not adduced support for it. And there is no support for Cortez's premise that a performance deficiency is presumptively traceable to a claimed conflict. A showing to that effect is instead required. *Cf. United States v. Levy*, 25 F.3d 146, 158 (2d Cir. 1994) ("In sum, by sufficiently showing that [attorney's] conflicts prompted him to forgo a viable line of defense, [defendant] has sufficiently demonstrated an adverse effect upon [attorney's] representation to establish a Sixth Amendment violation.").

The Court accordingly, joining both the New York state courts and the Report, denies Cortez's conflict-based ineffective assistance claims.

### 2.    Substantive Ineffective Assistance Claim

Cortez also makes what the Report termed a "substantive" ineffective assistance claim with respect to his trial attorneys.  In this claim, evaluated under the *Strickland* standard, Cortez argues that his counsel's failure to investigate and/or take certain actions with respect to five categories of evidence (fingerprints, video surveillance, human hairs, cell phone records, and potentially inculpatory witnesses as to Haughn) was unreasonable and prejudiced him.  The Report recommended finding that (1) this claim was not procedurally barred, (2) the 440 Court unreasonably applied *Strickland*'s first prong as to the fingerprint and surveillance video evidence, but (3) the 440 Court reasonably applied *Strickland*'s second prong in finding a lack of prejudice.  Report at 41–56.  The parties raise objections to aspects of these recommendations.

#### a.    *Finding of no procedural bar*

The State makes a limited objection to the Report's finding of the lack of a procedural bar.  It argues that the Report erroneously expanded the record by considering an affidavit from Cortez's habeas counsel describing Florio's purported reaction to being told of the surveillance video of Haughn walking away from Woods's apartment.  Cortez argues that Florio's reported reaction reveals that she did not know of this video, despite its having been produced to the defense in pretrial discovery.  Resp. Obj. at 3–5.  In his initial 440 motion, Cortez pursued the claim that his trial counsel were ineffective for having failed to review and make use of this footage.  But his postconviction counsel first submitted the affidavit in question on the motion to reargue, and the 440 Court therefore declined to consider the affidavit, explaining: "The affidavits submitted with the motion to reargue [were] not under the court's consideration, as reargument shall not include any matters of fact not offered on the prior motion."  Reargument

Decision at 5.  The State objects that, in light of this history, the Report likewise should not have considered this evidence.  Resp. Obj. at 3–5.

This objection is well founded.  The Court accordingly will not consider the affidavit in its assessment of the remainder of the Report.  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 182.  It is common ground that the ineffective assistance claim in general, and the portion of it faulting trial counsel for mishandling the surveillance evidence, was adjudicated on the merits by the 440 Court.  Because the 440 Court declined to consider the affidavit in question on the grounds that it was delinquently submitted, this Court is similarly constrained, on federal habeas review, from considering this affidavit.

To be sure, this holding eliminates only a discrete item from the cognizable record before the Court on the ineffectiveness claim, to wit, that Florio was purportedly "astounded to learn that there was a surveillance video that depicted Haughn leaving."  Dkt. 2, Ex. 9 at 54 ¶ 7.

        *b.*     *Merits:* Strickland *analysis*

The Report found that the 440 Court, in not finding a deficiency in trial counsel's work, unreasonably applied *Strickland*'s performance element to counsel's handling of the fingerprint and surveillance evidence.  Report at 42–45.  The Report found that the 440 Court reasonably applied the prejudice element in finding that counsels' asserted lapses, viewed together, did not prejudice Cortez's defense.  *Id.* at 45–52.

        i.     Performance element

The 440 Court found counsel's performance not deficient in any respect.  Evaluating counsel's performance in five discrete areas, the Report found that the 440 Court unreasonably applied federal law in finding counsel's handling of fingerprint and video surveillance evidence

to satisfy *Strickland*, but found the 440 Court reasonable in finding counsel's performance

otherwise to satisfy *Strickland*. Each party has objections to this ruling.

(a)    Fingerprint evidence

The State objects to the Report's conclusion that the 440 Court unreasonably applied

federal law by holding that trial counsel's failure to pursue expert testimony regarding Cortez's

allegedly bloody fingerprint on Woods's apartment wall was not deficient. Before the 440 Court

and here, Cortez produced an affidavit from fingerprint expert Kenneth Moses. *See* Dkt. 2, Ex. 9

at 76. That affidavit states, in relevant part:

> In January 29, 2007, I was contacted by attorney Dawn Florio who asked to retain
> me to examine blood patterns and an alleged bloody fingerprint on behalf of her
> client, Paul Cortez. I agreed whereupon she sent me digital images of the latent
> fingerprint and surrounding areas of the bedroom wall. After three hours of
> examination, I issued an oral report to Ms. Florio on January 31 stating that I could
> confirm the identification but I could not confirm that the fingerprint was bloody.
> I stated that it would be necessary that I examine the original piece of sheetrock
> containing the latent print as well as the surrounding blood patterns. Such
> examination would not only allow me to determine whether or not it was a bloody
> print but also whether the print had been placed before or after the blood stains on
> the wall.

> I did not hear back from attorney Florio after delivering my report on January 31,
> 2007. I assumed that the client had plead [sic] or the case had otherwise been
> resolved. Ms. Florio ignored my invoices and never paid me for my analysis.

*Id.* ¶¶ 3–4. Moses's account thus supports that despite Florio's having contacted Moses, and

despite his report to her that an examination of the sheetrock containing the fingerprint had the

capacity to disprove that it was bloody, Florio failed to follow up to commission such analysis.

Cortez argues that, given the importance of the fingerprint evidence, Florio's failure to pursue

this lead with an expert who was prepared to take on such work was ineffective, as was her

questioning of the prosecution's expert witness on this point.

50

The 440 Court discounted this failing. It discerned a broader strategy by defense counsel to minimize the physical evidence, while pointing to Haughn as the killer. RA1278. It found that, in pursuing this strategy, experienced counsel put on a satisfactory defense, which entailed "vigorously cross-examin[ing]" prosecution witnesses to develop the theme that Haughn was the killer, and that the defense foreswore calling "certain experts because perhaps they would not have supported the defendant's theory of the case (that David Haughn was the killer)." RA1279.

The Report disagreed. It did not find justifiable the reason that the 440 Court imagined as to why Florio might have failed to follow up with Moses. As the Report noted, the work that Moses proposed to take had the potential to bolster the defense's strategy of minimizing the import of the prosecution's physical evidence. Report at 43–44. In rationalizing this lapse, the Report found, the 440 Court unreasonably applied *Strickland. Id.* at 44.

The State objects to this conclusion. It notes that Moses's initial review of the fingerprint evidence revealed harmful information for the defense, in that it "confirmed a key aspect of the prosecution's theory—that the fingerprint on the wall was petitioner's[.]" Resp. Obj. at 2. The State argues that the 440 Court was correct to find reasonable the decision not to pursue this line of investigation any further, given that Moses work stood to yield evidence that "would be fruitless or even harmful." Resp. Obj. at 2–3 (citing *Strickland*, 466 U.S. at 691).[12]

That objection is unavailing for two reasons. First, the State misapprehends the salience of the fingerprint evidence. The fingerprint was salient because it was bloody. That a fingerprint

---

[12] To the same effect, the State also objected because it found factually unsupported the Report's statement that Moses had told Florio that a second person's fingerprints might be on the wall segment. Resp. Obj. at 2. The State later retracted that critique, after being alerted to a second Moses Affidavit, from 2016, which recounts that Moses orally told Florio that he could see from the photograph of the wall "additional ridge structure" that could denote more fingerprints. Dkt. 66, Ex. 2. The Court disregards this issue, as it does not read the Report's finding – that Florio's failure to engage Moses was unreasonable – to turn on this detail.

of Cortez's was found in Woods's apartment on its own was a non-event, given the undisputed fact that Cortez had had a relationship with Woods and had been in her apartment. As such, the possibility that Moses's testimony—had the defense chosen, after Moses completed his work, to offer it—might reveal a fingerprint of Cortez's did not stand to materially harm Cortez's cause. This was not a valid justification for not pursuing the lead Moses identified, which, depending on the results of the work Moses proposed to undertake, had potential to help Cortez if it established that his fingerprint was not bloody.

Second, the State's objection ignores the Report's reasoning. It faulted the 440 Court for hypothesizing an explanation why a reasonable attorney might decline to call an expert witness. But, as the Report noted, that explanation attacked a straw man. Florio's lapse was in failing to investigate the composition of the fingerprint, not in not calling Moses. The hypothesis offered by the 440 Court did nothing to explain Florio's failure to follow up with Moses. Dkt. 2, Ex. 9 at 76 ¶¶ 3–4. On the record before the 440 Court, there was no justification for that blunder. *See, e.g., Henry v. Poole*, 409 F.3d 48, 71 (2d Cir. 2005) (objectively unreasonable application of *Strickland* performance prong to deem attorney performance a tactic when presentation of prejudicial alibi evidence for wrong date was indefensible); *Loliscio v. Goord*, 263 F.3d 178, 195 (2d Cir. 2001) (unreasonable application of *Strickland* performance prong to deem tactic strategic when facts on the ground suggested strategy was "incoherent"); *Pavel v. Hollins*, 261 F.3d 210, 223 (2d Cir. 2001) (decision not to call medical expert not reasonable one based on strategy where failed to consult with expert before trial). *Strickland* recognizes a "strong presumption" that defense counsel's conduct was reasonable, but it requires courts to "judge [counsel's] conduct on the facts of the particular case[.]" *Strickland*, 466 U.S. at 690. The 440

Court failed to do so as to this dimension of defense counsel's work, and the Report rightly found its assessment an unreasonable application of federal law.

(b)    Video surveillance

The Report likewise found that the 440 Court unreasonably rationalized trial counsel's failure to introduce, "or at the very least, be[] aware of," the surveillance video depicting Haughn walking away from Woods's apartment the night of the murder at a time that Cortez theorizes is 6:37 p.m. Report at 45. The State's sole objection to this aspect of the Report is the valid point, discussed above, that the affidavit describing Florio's post-trial "surprise" at learning about the video after the fact was not properly before the 440 Court and hence not cognizable here. But eliminating that affidavit does not undermine the Report's broader conclusion that trial counsel were unreasonable "to have failed to introduce the surveillance evidence, *or* at the very least, been aware of what it depicted," including investigating whether the times corresponding to the events depicted on the video could be pinned down. Report at 45 (emphasis added). Because the State does not specifically challenge that aspect of the Report's reasoning, the Court reviews it for clear error.

The Court concurs with the Report that the 440 Court unreasonably applied federal law in not engaging with counsel's failure to investigate the video's timing to determine whether it was potentially exculpatory. The 440 Court's conjecture that the defense had a trial strategy to forego physical evidence so as to focus on Haughn is unpersuasive, both because that strategy would not explain not investigating the timespan that the video depicted, and because, were the video to reflect Haughn walking away from Woods's building at 6:37 p.m., such could have fortified, to some degree, the defense theory that he was the killer. The 440 Court unreasonably applied *Strickland* in whitewashing this lapse. *See, e.g., Cornell v. Kirkpatrick*, 665 F.3d 369,

379 (2d Cir. 2011) (objectively unreasonable to deem failure to object as to venue a strategic choice when record indicated it was instead an oversight); *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001) (counsel's failure to introduce available medical evidence that tended to buttress theory pursued at trial could not have been backed up by strategy); *Rompilla v. Beard*, 545 U.S. 374, 383–84 (2005) ("obvious" reason counsel's performance fell below reasonableness threshold was failure to look through files). The Court thus adopts the Report's reasoning on this prong, save to the extent the Report relies upon the extra-record affidavit.

(c)    DNA testing; cell records; witness interviews

The Report found that the 440 Court reasonably applied *Strickland* in finding reasonable counsel's not having (1) conducted DNA testing on hairs clutched in Woods's hands, (2) called a cell phone expert, and (3) investigated if other additional witnesses could place Woods's murder in time or inculpate Haughn for the same. Cortez objects, disputing that these decisions are defensible as "strategic," insofar as each such step conceivably could have yielded exculpatory evidence. But as both the 440 Court and the Report recognized, counsel, to render effective assistance, need not pursue all potential such avenues. The fingerprint and surveillance evidence addressed above, depending on the results of the investigation that counsel forewent, had clear capacity to bolster arguments the defense made at trial. The same is less so of the DNA testing, cell phone expert, or witness interviews.

With respect to DNA testing, as the Report recognized, Cortez's trial counsel exploited the absence of investigation at trial, "us[ing] the fact that the hair had not been tested in their defense." Report at 46; *cf. Speringo v. McLaughlin*, 202 F. Supp. 2d 178, 192 (S.D.N.Y. 2002) (by not ordering fingerprint comparison, counsel left room to argue alternatives). With respect to a cell phone expert, as the Report recognized, Cortez did (and realistically could) not "dispute[]

the most important fact that comes from the cell phone records—that they place him in the vicinity of Woods's apartment at the time she was murdered." *Id.* at 48. Cortez has not explained why a cell phone expert's elaboration on these calls would have materially assisted his cause. *See, e.g., Buitrago v. Scully*, 705 F. Supp. 952, 954 (S.D.N.Y. 1989) (lawyer's performance not deficient for failing to call alibi witness where no indication that witness could provide persuasive alibi). And with respect to witnesses whom the defense did not call, Cortez does not indicate how their testimony would have materially changed the trial narrative. *See, e.g., Murden v. Artuz*, 497 F.3d 178, 199 (2d Cir. 2007) (decision not to call witnesses not ineffective where no indication any could be of much use). As an illustrative example, Cortez faults trial counsel for not calling the fiancée of Andrew Gold, the neighbor of Woods who testified to hearing an altercation in his building, while on the phone with his fiancée. There is no basis to believe that the fiancée's testimony would have assisted the defense's case, such that not calling her can be found unreasonable.

The Court thus adopts the Report's application of *Strickland* to these three categories of alleged failings by trial counsel.

ii.    Prejudice prong

Because the Report found counsel's performance deficient in two respects, relating to the fingerprint evidence and the video surveillance footage, it reached *Strickland*'s second element: whether "the deficient performance prejudiced the defense." 466 U.S. at 687. The 440 Court had also addressed this element, notwithstanding not having found that constitutionally deficient performance. It held that, assuming *arguendo* that Cortez had met Strickland's first element, the evidence of his guilt was overwhelming, and there was no basis to find that Cortez's defense "would have more than likely prevailed at trial" than the one pursued by trial counsel. RA1282.

The Report, applying AEDPA's standards, found that application of *Strickland* reasonable. Cortez objects to the Report's reasoning on several grounds. Cortez Obj. at 20–24.

First, Cortez objects to the Report's observation that—the two investigative deficiencies notwithstanding—trial counsel was still able to present to the jury, based on other evidence, its theories that the fingerprint had not been made in Woods's blood and that the prosecution's timeline of events was open to debate. Cortez Obj. at 20–21 (citing Report at 52). That objection is not well taken. The Report's factual observation to this effect was undisputably correct. And its comment that the jury can fairly be assumed to have considered these defense theories was fair. Contrary to Cortez's suggestion, the Report does not imply that trial counsel's advocacy on these points was as strong as it could have been had counsel pursued the two investigative avenues it forewent—and had they borne maximal fruit. But, as the Report rightly noted at the start of its prejudice analysis, the premises that Cortez's fingerprint would have been proven on further examination not to be in blood or that the timeline revealed by the surveillance would have proven helpful to the defense cannot be assumed to be true. Rather, as the Report highlighted, the 440 Court noted—in the key observation supporting its finding of a lack of prejudice—that Cortez had not put anything before it "to suggest that [he] could have presented a more colorable claim" than that "which he did present through trial counsel." Report at 50 (citing RA1282). Put differently, with Cortez not having pursued these investigative avenues to completion, his post-conviction claim of prejudice from counsels' investigative lapses was conjectural. *See, e.g.*, *Lynn v. Bliden*, 443 F.3d 238 (2d Cir. 2006), *as amended*, (May 19, 2006) (state court did not err in finding no prejudice in part based on fact that additional evidence would only add marginal value to overarching narrative already presented at trial).

Cortez next objects that the Report "wrongly downplays the significance of the surveillance video" depicting Haughn. Cortez Obj. at 21. But, as reviewed above in the discussion of Cortez's claim of actual innocence, even assuming that the file stamps accurately recorded Haughn as leaving Woods's apartment at 6:37 p.m.—a premise which Cortez has not substantiated—that fact would not exonerate Cortez. It would not definitively place Haughn in the apartment during Woods's murder. It would narrow, but not eliminate, the timeline consistent with Cortez's guilt. It would not neutralize the compelling circumstantial and motive evidence implicating Cortez. And itt would not neutralize the problematic aspects of his alternative theory that Haughn was the killer. The 440 Court and the Report were both on solid ground in not treating this evidence—even assuming the file stamps carried the meaning Cortez assigns them—as game-changing.

In addition, Cortez objects that the Report and the 440 Court viewed the prosecution's case as stronger than it was, assuming that Cortez's fingerprint were found not to have been in blood and that the timeline revealed by the surveillance video were as Cortez posits. Cortez Obj. at 21–23. But the Report, applying AEDPA's standard of review, reasonably found sound the 440 Court's evaluation of the substantial body of evidence implicating Cortez. Cortez's argument effectively reprises arguments that the jury did not accept: for example, that (1) the bloody boot-print on Woods's bed sheet should be discounted because the boot style and size were popular ones for adult males; (2) Cortez's being in the vicinity of Woods's apartment around the time of the murder should be discounted, despite Cortez's failure to account for that when interviewed after the murder, because hundreds of thousands of other New Yorkers, including Haughn, were also in that vicinity, and (3) other evidence of guilt should be discounted as circumstantial or as non-probative if viewed in isolation. Cortez Obj. at 21. But viewing the

ample evidence inculpating Cortez in combination, the Court, like the Report, cannot find that

the 440 Court "applied *Strickland* to the facts of his case in an objectively unreasonable manner."

*Bell v. Cone*, 535 U.S. 685, 698–99 (2002). "The prejudice inquiry is . . . ineluctably tied to the

strength of the prosecution's case," *Garner v. Lee*, 908 F.3d 845, 862 (2d Cir. 2018), and here,

the 440 Court reasonably appraised that case as strong and did not view Cortez's proposed new

evidence as compelling. *See id.* at 870 (no prejudice where petitioner argued additional evidence

showed shooting happened at time he was on the phone, but evidence was inconclusive as to

time of shooting petitioner was convicted of committing); *Whitley v. Ercole*, 965 F. Supp. 2d

344, 352–53 (S.D.N.Y. 2013) (upholding Appellate Division's finding of no prejudice from non-

receipt of recantation evidence despite fact that "prosecution did not present an overwhelming

case" against petitioner); *Waiters v. Lee*, 857 F.3d 466, 484 (2d Cir. 2017) (under AEDPA

review, court could not find state court's finding of no prejudice objectively unreasonable where

evidence obfuscated by counsel's ineffectiveness would not have "so clearly 'alter[ed] the entire

evidentiary picture' that the trial court's decision is indefensible" (quoting *Strickland*, 466 U.S. at

696)).

     In sum, the Court, like the Report, does not find that the determinations of the 440 Court

on Cortez's claim of substantive ineffective assistance were objectively unreasonable. The Court

therefore adopts the Report's reasoning and denies Cortez's ineffective assistance claims.[13]

---

[13] Cortez raises other objections to the Report's evaluation of whether trial counsel's asserted failures to obtain DNA testing of the hair in Woods's hands, to call cell phone experts, and to call certain witnesses would work prejudice under the *Strickland* standard. Cortez Obj. at 22–23. Because this Court adopted the Report's reasoning that these deficiencies failed at *Strickland* prong one, and because Cortez's objections on these elements do not take into account the high standard for AEDPA review, the Court finds that these objections do not disturb the Report's recommendation or reasoning.

### C.    Prosecutorial Misconduct Claim

Cortez, finally, claims a violation of due process based on prosecutorial misconduct. Specifically, he argues that the prosecution made "explicit falsehoods to the jury" in summation and lied in its briefing to the 440 Court.

As a general rule, "prosecutorial misconduct cannot give rise to a constitutional claim unless the prosecutor's acts constitute 'egregious misconduct.'" *Miranda v. Bennett*, 322 F.3d 171, 180 (2d Cir. 2003) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647–48 (1986)); *see also Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) (standard for reversal of a conviction based on improper prosecutorial comments is extremely high). Courts assess claims of actual prejudice based on prosecutorial misconduct by "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998).

The Report found that Cortez's claims for prosecutorial misconduct were procedurally barred because Cortez failed to exhaust these claims: Cortez did not raise his instant prosecutorial misconduct claims on direct appeal, and was thus barred under N.Y. C.P.L. 440.10(2)(c) from raising the claims on collateral review. Report at 56–57. Again, out of an abundance of caution, however, the Report considered and rejected the misconduct claims on their merits, finding that across the board the prosecutor's comments were likely fair comments on the evidence or procedural history of the case, and in any event were not "so egregious that it rendered the trial fundamentally unfair." Report at 56–59 (quoting *Branch v. Marshall*, No. 08 Civ. 8381 (PKC) (JLC), 2010 WL 5158632, at *14 (S.D.N.Y. Oct. 12, 2010), *adopted by* 2010 WL 5158633 (Dec. 16, 2010)).

Cortez objects to the Report's recommendations in this vein solely by reference to his initial briefing on the matter. Cortez Obj. at 24. The Court thus reviews this section of the

Report for clear error. The Court finds none. Indeed, even were this Court to exercise *de novo* review, it would adopt the Report's recommendation that the prosecutorial claim is procedurally barred. "New York law prohibits review of a claim on collateral review when the defendant unjustifiably fails to raise the claim on direct appeal." *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001) (citing § 440.10(2)(c)). Because Cortez has failed to do so, and was thus precluded from having them heard on collateral review in state court, these claims are both unexhausted and procedurally defaulted. Further, to whatever extent Cortez's misconduct claims based on the State's 440 briefing are different, they are nonetheless not properly before this Court on habeas review, as it is impossible that they would have affected the validity of Cortez's conviction.

## CONCLUSION

For the foregoing reasons, the Court adopts the Report, save with the minor modifications noted herein, and denies Cortez's petition.

Pursuant to 28 U.S.C. § 2253(c), a district court may issue a certificate of appealability in a habeas corpus action under § 2254 "only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c). The district court is required to indicate the "specific issue of issues" that satisfy this showing. *Blackman v. Ercole*, 661 F.3d 161, 163–64 (2d Cir. 2011).

For the reasons given above, in particular that Cortez has established performance deficiencies on the part of his trial counsel, the Court finds that Cortez has satisfied this standard with respect to his claims of ineffective assistance of counsel. The Court thus issues a certificate of appealability on Cortez's Sixth Amendment claims. The Court, however, declines to issue a certificate of appealability on the balance of Cortez's petition.

The Clerk of Court is respectfully directed to terminate all pending motions and close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 8, 2024
      New York, New York